UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| EDWIN GEORGE DUFFUS,<br><br>Plaintiff,<br><br>v.<br><br>MAINEHEALTH and<br>MAINE MEDICAL CENTER,<br><br>Defendants. | Civil Action No. 2:24-cv-00268-SDN |

**DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO F.R.CIV.P. 12 (b)(6)**

NOW COME Defendants MaineHealth and Maine Medical Center ("MMC"), by and through counsel, Norman Hanson & DeTroy, LLC, and hereby move to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff's Complaint fails to state a viable claim for failure to stabilize pursuant to the Emergency Medical Treatment and Active Labor Act ("EMTALA"). The Plaintiff was accepted by MMC in transfer for the purposes treating him following an acute hemorrhagic stroke, and thereafter he was admitted to MMC in good faith and remained hospitalized as an inpatient for a period of twelve days, during which time he received stabilizing treatment – including treatment in the Neurocritical Care Unit – prior to discharge. By accepting the Plaintiff for treatment of his hemorrhagic stroke, admitting him in good faith for an extended period and providing stabilizing care, the Defendants met

their stabilization obligations under EMTALA. *Walley v. York Hospital,* No. 2:18-CV-126-DBH, 2018 WL 3614967 (D. Me. July 27, 2018). Therefore, the Complaint should be dismissed.

## BACKGROUND

The Plaintiff's Complaint alleges the following: Edwin Duffus is a Jamaican citizen who was employed as a farm worker in Warren, Maine during 2022 pursuant to a temporary H-2A work visa. (*Complaint* ¶ 5, ECF No. 1.) On July 17, 2022, at approximately 7:30 am, the Plaintiff suffered a hemorrhagic stroke in Warren. (*Id.* ¶ 12.) He was transported to Pen Bay Medical Center in Rockport, Maine, where he was diagnosed with hypertension and an intracerebral hemorrhage. (*Id.* ¶ 13.) Pen Bay Medical Center contacted MMC, a tertiary care hospital located in Portland, and requested the Plaintiff's transfer so that he could be treated for his stroke and hemorrhage at MMC. (*Id.* ¶¶ 9, 14.) MMC accepted the requested transfer of the Plaintiff. (*Id.* ¶ 15). As a result, the Plaintiff was transported by LifeFlight helicopter to MMC, where he arrived at approximately 11:20 am on July 17. (*Id.* ¶ 16.)

The Plaintiff was admitted by MMC into its Neurocritical Care Unit on July 17. (*Id.* ¶ 18.). The Plaintiff admits that he remained admitted as an inpatient at MMC for twelve days, from July 17 to July 29, 2022 (*Id.* ¶ 19.). The Plaintiff's Complaint omits reference to the details of the extensive medical care provided to the Plaintiff during his twelve-day admission at the hospital, prior to his discharge. Nevertheless, the Plaintiff acknowledges that the Plaintiff was cared for by a "care

team" at the hospital, including Neurocritical Care, Pulmonology/Critical Care Medicine, and therapy (*Id.* ¶¶ 18, 20, 23.).

The Plaintiff alleges his recorded blood pressure was 157/90 on the day before his discharge, and that members of the Plaintiff's care team recommended that the Plaintiff "be discharged to [ ] acute rehabilitation", and/or that the Plaintiff "would benefit from increased time here prior to taking a flight back to Jamaica to improve strength and balance". (*Id.* ¶¶ 22-24.) Plaintiff further alleges that the therapy he received at MMC was incomplete at the time of his discharge. (*Id.* ¶¶ 21, 23-24.) The Plaintiff alleges that he experienced effects of the stroke and hemorrhage that he suffered, including difficulty speaking and performing physical motions. (*Id.* ¶ 25.)

On July 29, 2022, the Plaintiff was discharged from MMC and released to the custody of the Jamaica Central Labour Organization ("JCLO"), an agency of the Jamaican government located in Washington, D.C. that is tasked with facilitating and monitoring Jamaican H-2A workers in the United States. (*Id.* ¶ 28.) JCLO arranged for the Plaintiff to be flown to Jamaica, where the Plaintiff would have the support and assistance of his family. (*Id.* ¶ 34.). After returning to Jamaica, on August 15, 2022, the Plaintiff suffered a relapse and required medical attention. (*Id.* ¶ 46.)

In his Complaint, the Plaintiff alleges that the MMC violated EMTALA's "patient-dumping" prohibitions by failing to stabilize the Plaintiff prior to his discharge. (*Id.* ¶ 1.)

## Argument

### A. Legal Framework

#### 1. Standard of Review

A party may seek dismissal of a claim based upon "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court "must evaluate whether the complaint adequately pleads facts that state a claim to relief that is plausible on its face." *Guilfoile v. Shields*, 913 F.3d 178, 186 (1st Cir. 2019) (quotation marks omitted). To evaluate the sufficiency of a claim, the Court must "first, 'isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements,' then 'take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief.' " *Zell v. Ricci*, 957 F.3d 1, 7 (1st Cir. 2020) (alteration omitted) (quoting *Zenon v. Guzman*, 924 F.3d 611, 615-16 (1st Cir. 2019)). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels [a court] "to draw on" [its] "judicial experience and common sense." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). The Court will not "draw unreasonable inferences or credit bald assertions," *Guilfoile v. Shields*, 913 F.3d 178, 186 (1st Cir. 2019) (quotation marks omitted), and must "disregard all conclusory allegations that merely parrot the relevant legal standard". *Young v. Wells Fargo Bank, N.A.*, 717 F.3d 224, 231 (1st Cir. 2013).

### 2. EMTALA

"Congress enacted EMTALA in 1996 in response to claims that hospital emergency rooms were refusing to treat patients with emergency conditions but no medical insurance." *Ramos-Cruz v. Centro Medico del Turabo*, 642 F.3d 17, 18 (1st Cir. 2011) (internal citations omitted). EMTALA therefore "is a limited anti-dumping statute, not a federal malpractice statute." *Id.*; *see Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995) ("EMTALA does not create a cause of action for medical malpractice."); *Walley v. York Hosp.*, No. 2:18-CV-126-DBH, 2018 WL 3614967, at *1 (D. Me. July 27, 2018). EMTALA is designed to prevent hospital emergency rooms from refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance. *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1189. "Congress did not intend EMTALA to supplant existing state-law medical malpractice liability with a federal malpractice standard of care; the minimal screening and stabilization requirements were designed solely to prevent the specific injury of patient 'dumping,' which state malpractice law often could not redress." *Fraticelli-Torres v. Hosp. Hermanos*, 300 F. App'x 1, 3–4 (1st Cir. 2008) (citing *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 83–84 (1st Cir.2000)).

## B. Plaintiff's Complaint should be dismissed pursuant to Rule 12(b)(6) because it fails to state claims upon which relief can be granted.

### 1. Counts A and B of the Plaintiff's Complaint fail as a matter of law because the Defendants met their EMTALA stabilization obligations by, *inter alia*, accepting the Plaintiff in transfer following his hemorrhagic stroke, admitting the Plaintiff as an inpatient in good faith for a period of twelve days, and providing stabilizing care prior to discharge.

In Count A, the Plaintiff alleges that the Defendants violated EMTALA by failing to stabilize the Plaintiff. In Count B, the Plaintiff alleges that he was "improper[ly] discharge[d]" because he was allegedly not stabilized prior to discharge. Both counts fail to state a viable claim because the Plaintiff was stabilized in accordance with EMTALA.

To establish an EMTALA violation based upon failure to stabilize, a plaintiff must establish, *inter alia*, that the hospital "bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition." *Correa*, 69 F.3d at 1190. EMTALA provides that if an individual "comes to a hospital and the hospital determines that the individual has an emergency medical condition, the hospital must provide either—

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c).

42 U.S.C. § 1395dd(b)(1).

Subsection (c) provides: "[i]f an individual at a hospital has an emergency medical condition <u>which has not been stabilized</u>," a hospital may only transfer or discharge a patient under certain conditions. 42 U.S.C. § 1395dd(c)(1) (emphasis added).

The term "*to stabilize*," as used in subsection (b) means: "to provide such medical treatment of the condition as may be necessary to assure, within reasonable

medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." *Id.* § 1395dd(e)(3)(A). The term "*stabilized*," as used in subsection (c), means" "no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(B).

The Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS) has promulgated regulations regarding EMTALA's stabilization requirement. In relevant part, the CMS regulations expressly state that "[i]f the hospital admits the individual as an inpatient for further treatment, the hospital's obligation under this section ends, as specified in paragraph (d)(2) of this section." 42 C.F.R. § 489.24(a)(1)(ii) (emphasis added). In turn, paragraph (d)(2) provides as follows:

> If a hospital has screened an individual under paragraph (a) of this section and found the individual to have an emergency medical condition, and admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition, the hospital has satisfied its special responsibilities under this section with respect to that individual.

42 C.F.R. § 489.24(d)(2)(i) (Emphasis added). The CMS regulations define an "inpatient" as "an individual who is admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services as described in § 409.10(a) of this chapter with the expectation that he or she will remain at least overnight and occupy a bed even though the situation later develops that the individual can be discharged

or transferred to another hospital and does not actually use a hospital bed overnight. 42 C.F.R. § 489.24(b).

This Court previously analyzed EMTALA's stabilization requirements in the context of an admitted patient in *Walley v. York Hospital,* No. 2:18-CV-126-DBH, 2018 WL 3614967 (D. Me. July 27, 2018). In *Walley*, the plaintiff was admitted at York Hospital following a stroke, before she was transferred to "a primary stroke center" (notably, Maine Medical Center). The plaintiff suffered another stroke prior to transfer. The plaintiff alleged that York Hospital failed to appropriately screen her, failed to stabilize her, and failed to timely transfer her." *Id.*, at * 2. As in the present case, in *Walley*, it was undisputed that the patient was admitted to the defendant hospital, and there was no allegation that the hospital was acting in bad faith in admitting the patient. *Id.* at *2. The Court held, consistent with the "vast majority" of courts outside the First Circuit[1], that the CMS regulation should be applied, and that there was no viable cause of action under EMTALA where the patient was admitted to the hospital in good faith. *Id.* at *2-3 (citing *Thornhill v. Jackson Par. Hosp.*, 184 F. Supp. 3d 392, 399, 401 (W.D. La. 2016) (collecting cases and stating that "[o]nce a hospital admits a patient in good faith . . . state medical malpractice law supplies the relief." (quotation marks omitted))); *see also Williams v. Dimensions Health Corp.*, 952 F.3d 531, 536 (4th Cir. 2020) (concluding that "[CMS] regulation confirmed that a hospital's admission of a patient for treatments

[1] The Court noted that it had not found any cases in the First Circuit interpreting the CMS regulations.

effectively acts as a defense to an EMTALA claim").[2] Notably, in *Walley*, the Court explained that an EMTALA claim for "inappropriate" transfer under 42 U.S.C. § 1395dd(c) "would be foreclosed" because the CMS regulations "terminate EMTALA obligations—including compliance with § 1395dd(c)—once an individual has been admitted as an inpatient in good faith." *Walley*, 2018 WL 3614967, at *2 n.3.

Courts interpreting EMTALA have routinely concluded that a hospital's obligations are satisfied upon a patient's inpatient admission. *See, e.g.*, *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1168-69 (9th Cir. 2002) (holding that "the stabilization requirement normally ends when a patient is admitted for inpatient care," unless a plaintiff "demonstrates in a particular case that inpatient admission was a ruse to avoid EMTALA's requirements"; *Bryan v. Rectors & Visitors of Univ. of Virginia*, 95 F.3d 349, 351 (4th Cir. 1996) (rejecting patient's interpretation of EMTALA that "hospital would have to provide treatment indefinitely—perhaps for years—according to a novel, federal standard of care derived from the statutory

[2] Although the Sixth Circuit has concluded that "EMTALA imposes an obligation on a hospital beyond simply admitting a patient with an emergency medical condition to an inpatient care unit," that court's conclusion in *Moses* is based upon a distinct fact pattern, which varies from the allegations presented in the Plaintiff's Complaint. *Moses v. Providence Hosp. & Med. Centers, Inc.*, 561 F.3d 573, 582 (6th Cir. 2009). In *Moses*, medical providers determined that a patient presenting with an emergency, including hallucinations and delusions, should be admitted for evaluation. *Id.* at 576. After four days of evaluation at the hospital, a medical provider determined that the patient "should be transferred to the hospital's psychiatric unit"; however, the patient was never transferred to the psychiatric unit and was then released from the hospital the following day. *Id.* at 576-577. After the hospital failed to transfer the patient to the psychiatric unit, the patient murdered another individual 10 days after his release from the hospital. *Id.* at 577. Although Moses analyzed the CMS regulation, the court ultimately concluded that the regulation was promulgated after the events at issue and, therefore, did not apply in that case. *Id.* at 583-584.

stabilization requirement")[3]; *see also Mazurkiewicz v. Doylestown Hosp.*, 305 F. Supp. 2d 437, 448 (E.D. Pa. 2004) (dismissing EMTALA claim where plaintiff "was admitted and there [was] no indication that this admission was done to avoid responsibility under EMTALA"). Indeed, in *Bryan*, the Fourth Circuit noted that a patient's care after admission "becomes the legal responsibility of the hospital and the treating physicians," which is "then governed not by EMTALA but by the state malpractice law that everyone agrees EMTALA was not intended to preempt." *Bryan*, 95 F.3d at 351. And, as the Ninth Circuit concluded, "[a]fter an individual is admitted for inpatient care, state tort law provides a remedy for negligent care. If EMTALA liability extended to inpatient care, EMTALA would be converted into a federal malpractice statute, something it was never intended to be." *Bryant*, 289 F.3d at 1169 (Quotation marks and alterations omitted).

Based upon the above cases and CMS regulations, a plaintiff must establish that a hospital admitted a patient in *bad faith*, as a ruse or sham to avoid EMTALA's anti-dumping protections, to prove a case of failure to stabilize claim where a patient is admitted to a hospital as an inpatient. *See Walley*, 2018 WL 3614967, at *2 & n. 4; *see, e.g.*, *Grages for Est. of Donovan v. Geisinger Health*, No. 4:19-CV-01141, 2021 WL 880475, at *5 (M.D. Pa. Mar. 9, 2021) (holding that "a party claiming an admission was not in good faith must plausibly allege that the hospital admitted the patient

[3] The First Circuit has cited to *Bryan* when analyzing an EMTALA claim, but left "for another day" whether EMTALA imposes a "temporal limitation" on inpatient care. *Lopez-Soto v. Hawayek*, 175 F.3d 170, 177 n.4 (1st Cir. 1999). *Lopez-Soto* was decided prior to implementation of the CMS regulations applicable here, 42 C.F.R. § 489.24(a)(1)(ii) 42 C.F.R. § 489.24(a)(1)(ii).

solely to satisfy its EMTALA obligations with no intent to treat the patient once admitted, and then immediately transferred or discharged the patient").

In this case, the Plaintiff does not allege, nor could he plausibly allege, that his admission was in "bad faith" or intended "solely to satisfy [MMC's] EMTALA obligations with no intent to treat" the Plaintiff. *Grages*, 2021 WL 880475, at *5. MMC accepted the Plaintiff's transfer from another hospital for the purpose of providing stabilizing treatment for his acute medical condition. (*Complaint*, ¶¶ 9, 14 - 19.) MMC admitted Plaintiff in its Neurocritical Care Unit, and the Plaintiff remained admitted as an inpatient for twelve days. (*Id.*) The Plaintiff complains that while admitted and being cared for, his blood pressure fluctuated, and MMC disregarded recommendations of medical providers, failed to complete his physical and occupational therapy, and failed to make appropriate plans related to the Plaintiff's post discharge care. (*Id.* ¶¶ 19-20, 22-25, 29, 53.) However, these complaints are, at most, allegations that the care provided to the Plaintiff was inadequate, i.e., standard malpractice claims that are not the purpose of EMTALA. *See, e.g.*, *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir. 2000) (recognizing that after patient received inpatient treatment at hospital, "any failures of diagnosis or treatment were then remediable under state medical malpractice law"). While the Plaintiff may have complaints about the care he received, or the discharge planning – and Defendants deny any such allegations – those complaints are standard malpractice allegations, and not EMTALA claims. *Bryan*, 95 F.3d 349, 352 (4th Cir. 1996) (noting that EMTALA is "quite clear that it is not intended to

preempt state tort law except where absolutely necessary", and citing 42 U.S.C. § 1395dd(f)'s mandate that EMTALA preempt no state law requirement "except to the extent that the requirement directly conflicts with a requirement of [EMTALA]").

In his Complaint, the Plaintiff includes a series of legal conclusions asserting that the above CMS regulation "conflicts with EMTALA" and is "invalid." However, these are not factual allegations that must be accepted by the Court, and furthermore, this argument is without merit. (*Complaint*, ¶ 68.) The CMS regulations are the correct interpretation of the statute because they limit EMTALA to what it is intended to be: an anti-dumping statute. As Judge Horton explained in *Walley*:

> This court, the First Circuit, and the Department of Health and Human Services' Centers for Medicare and Medicaid Services (CMS) have repeated time and again that EMTALA is not a medical malpractice statute. *See, e.g., Ramos-Cruz v. Centro Medico del Turabo*, 642 F.3d 17, 18 (1st Cir. 2011) (it "is a limited anti-dumping statute, not a federal malpractice statute."); *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1193 (1st Cir. 1995); *Feighery v. York Hosp.*, 59 F. Supp. 2d 96, 102 (D. Me. 1999); Medicare Program; Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals With Emergency Medical Conditions, 68 Fed. Reg. 53222, 53223 (Sept. 9, 2003) ("In enacting [the private right of enforcement in EMTALA], Congress did not intend for the statute to be used as a Federal malpractice statute."). Instead, Congress enacted EMTALA to stop so-called hospital "dumping" practices by which some hospitals denied admission to patients who lacked insurance or ability to pay. Congress did not create the federal law to supersede state law on medical malpractice.

*Walley*, No. 2:18-CV-126-DBH, 2018 WL 3614967, at *1 (emphasis added).

If EMTALA were interpreted to state a claim for civil liability based upon alleged negligence in caring for a patient during an extended inpatient hospitalization, or alleged negligence in discharge planning for a patient after the

extended admission, it would expand the statute beyond its intended purpose to establish a new standard of care based upon the EMTALA stabilization requirement, *see Bryan*, 95 F.3d at 351, and it would preempt traditional aspects of state medical malpractice law. That was not the purpose of EMTALA, and plaintiffs have other remedies in state law for such claims after a patient is admitted and stabilizing care is rendered. *Id*.

Very simply, the Plaintiff was not "dump[ed];" he was accepted for transfer, then admitted and provided stabilizing treatment for his medical condition for a period of twelve days prior to his discharge. As in *Walley*, the Court should deny the Plaintiff's claims because the Defendants met their obligations for stabilization pursuant to EMTALA. *See Walley*, 2018 WL 3614967, at * 3; 42 C.F.R. § 489.24(d)(2)(i); *see also Bryan*, 95 F.3d at 351; *Bryant*, 289 F.3d at 1169.

**2. Plaintiff's purported claim under the "Implementing Regulations" is not a valid cause of action under EMTALA.**

Lastly, Count C of Plaintiff's Complaint purports to assert a cause of action for "improper discharge planning" under 42 C.F.R. § 482.43. However, these regulations outlining the "Conditions of Participation" for a hospital that participates in Medicare do not create a private cause of action under EMTALA. A "plaintiff may not, merely by referencing the organic statute, enforce regulations that interdict a broader swath of conduct than the statute itself prohibits. After all, the power to create a private right of action, like the power to create positive federal law itself, lies exclusively with Congress." *Iverson v. City of Boston*, 452 F.3d 94, 100 (1st Cir. 2006) (citing *Alexander v. Sandoval*, 532 U.S. 275, 284-85 (2001)); *see Buck v. Am. Airlines, Inc.*, 476 F.3d 29,

33 (1st Cir. 2007) ("Regulations alone cannot create private rights of action; the source of the right must be a statute.") Notably, under the CMS regulations relied upon by Plaintiff in support of Count C, the regulations expressly state that "the provisions of this part serve as the basis of survey activities for the purpose of determining whether a hospital qualifies for a provider agreement under Medicare and Medicaid." 42 C.F.R. § 482.1(b). Thus, these cited regulations do not create a private right of action under EMTALA.

Accordingly, Count C of Plaintiff's Complaint does not present a viable cause of action and, therefore, should be dismissed.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that the Court dismiss Plaintiff's Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Dated at Portland, Maine this 25th day of November, 2024.

/s/ *Joshua D. Hadiaris*
Joshua D. Hadiaris, Esq. ~ Bar No. 4209

/s/ *Joseph M. Mavodones*
Joseph M. Mavodones, Esq. ~ Bar No. 6454

NORMAN, HANSON & DeTROY, LLC
Two Canal Plaza
P.O. Box 4600
Portland, Maine 04112-4600
(207) 774-7000
*jhadiaris@nhdlaw.com*
*jmavodones@nhdlaw.com*

*Attorneys for Defendants MaineHealth and Maine Medical Center*

## CERTIFICATE OF SERVICE

I hereby certify that on November 25, 2024, I electronically filed Defendants' Motion to Dismiss Plaintiff's Complaint with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Joshua D. Hadiaris*

Joshua D. Hadiaris, Esq. ~ Bar No. 4209
Attorney for Defendants

NORMAN, HANSON & DETROY, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME 04112-4600
(207) 774-7000
*jhadiaris@nhdlaw.com*