UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| EDWIN GEORGE DUFFUS,<br><br>Plaintiff,<br><br>v.<br><br>MAINEHEALTH and<br>MAINE MEDICAL CENTER,<br><br>Defendants. | Civil Action No. 2:24-cv-00268-SDN |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS**

Defendants MaineHealth and Maine Medical Center ("MMC"), by and through counsel, submit this Reply in support of their Motion to Dismiss and in response to Plaintiff's January 30, 2025, Opposition.[1] (*Motion* ECF No. 6; *Opposition* ECF 11.)

**A. Plaintiff asserts claims for which relief is available under State law.**

Plaintiff's Opposition concedes—as it must—that "EMTALA is not a federal malpractice statute." (Opposition, at 6.) Plaintiff also concedes that the facts alleged in support of his Complaint "will be similar to and indeed, will likely be the same in many respects, as the facts underlying a malpractice claim." (*Id.*) Specifically, the Opposition argues that Plaintiff's

[1] Although Plaintiff has attached to his Opposition two newspaper articles and referred to these articles in the "Background" section of the Opposition (Opposition, at 1; ECF Nos. 11-1, 11-2) these articles should be excluded by the Court in its review of the Complaint and Motion to Dismiss. *See* Fed. R. Civ. P. 12(d) (permitting the Court to exclude "matters outside the pleadings"); *see, e.g.*, *Galouch v. Maine Dep't of Pro. & Fin. Regul.*, 856 F. Supp. 2d 244, 251 (D. Me. 2012) (citing *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). The newspaper articles are not "official public records," not "central to" Plaintiff's asserted EMTALA claims, and not otherwise "referred to in the complaint." *Watterson*, 987 F.2d at 3. Rather, these two newspaper articles appear to be submitted as supporting documentation related to the farm worker program in which Plaintiff had participated. (*See* Complaint, ¶ 5.) Thus, because these two articles are not central to Plaintiff's claim or the matters at issue in the Motion, these documents should be excluded by the Court.

"hypertension had not been controlled" as of July 29, 2022, and that "his recuperative therapy was incomplete" after 12 days of treatment. (*Id*. at 5-6; *see* Complaint, ¶¶ 21-24.) There is no allegation that Plaintiff was *not* treated at MMC or otherwise turned away due to his emergency medical condition. At base, Plaintiff's claim is that the MMC providers allegedly failed to appropriately treat him while he was admitted at the hospital, and/or were allegedly negligent in discharging the Plaintiff after 12 days of inpatient care. These allegations—which the Defendants deny—may form the basis of a state malpractice claim, but they do not support an EMTALA claim.

"EMTALA created a remedy for patients in certain contexts in which a claim under state medical malpractice law was not available." *Reynolds v. MaineGeneral Health*, 218 F.3d 78, 83 (1st Cir. 2000) (emphasis added). Indeed, "it is clear that at a minimum Congress manifested an intent that all patients be treated fairly when they arrive in the emergency department of a participating hospital and that all patients who need some treatment will get a first response at minimum and will not simply be turned away." *Id*. To be sure, "Congress did not create the federal law to supersede state law on medical malpractice." *Walley v. York Hosp*., No. 2:18-CV-126-DBH, 2018 WL 3614967, at *1 (D. Me. July 27, 2018).[2]

Here, Plaintiff attempts to assert a claim for medical malpractice based upon alleged negligent care and discharge, under the title of an EMTALA claim. Notably, Plaintiff does not allege that he was "turned away," *Reynolds*, 218 F.3d at 83, at MMC (or Pen Bay). Rather, Plaintiff

[2] *See also, e.g., Hardy v. New York City Health & Hosp. Corp*., 164 F.3d 789, 792–93 (2d Cir. 1999) ("EMTALA is not a substitute for state law on medical malpractice"); *Baber v. Hosp. Corp. of Am*., 977 F.2d 872, 880 (4th Cir. 1992) ("The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an adequate first response to a medical crisis for all patients . . ." (quotation marks omitted); *Gatewood v. Washington Healthcare Corp*., 933 F.2d 1037, 1041 (D.C. Cir. 1991) ("[EMTALA] is not intended to duplicate preexisting legal protections, but rather to create a new cause of action, generally unavailable under state tort law, for what amounts to failure to treat. Though there may arise some areas of overlap between federal and local causes of action, most questions related to the adequacy of a hospital's standard screening and diagnostic procedures must remain the exclusive province of local negligence law.").

alleges that he first presented to the Pen Bay emergency department after experiencing a hemorrhagic stroke on July 17, 2022, was then transferred to MMC for inpatient treatment, and, after being admitted, received treatment at MMC for a period of 12 days. (Complaint, ¶¶ 12-16, 19.) The Plaintiff claims that he remained hypertensive and had not completed "recuperative therapy" at the time of discharge. (Opposition, at 5-6; *see* Complaint, ¶¶ 21-24.)

The claims asserted by Plaintiff relating to this care and discharge are grounded in negligence, for which relief is available under State law. *See, e.g.*, *Holmes v. E. Maine Med. Ctr*., 2019 ME 84, ¶ 17, 208 A.3d 792. This is why, as discussed below, courts and the relevant regulations have determined that EMTALA's stabilization obligations end once a patient is admitted, in good faith, for treatment of an emergency medical condition. Claims such as these may be sought in State court, and not by converting EMTALA into "a federal malpractice statute." *Reynolds*, 218 F.3d at 83 (quotation marks omitted); *see Fraticelli-Torres v. Hosp. Hermanos*, 300 F. App'x 1, 3 (1st Cir. 2008) ("Congress did not intend EMTALA to supplant existing state-law medical malpractice liability with a federal malpractice standard of care").

**B. The relevant CMS regulations are valid and represent the correct interpretation of EMTALA. Accordingly, they should be applied.**

Plaintiff argues that the CMS regulation, 42 C.F.R. § 489.24—which makes clear "that a hospital's obligations under EMTALA end when it admits an individual as an inpatient"—are "invalid" and should not be considered by the Court. (Opposition, at 7.) In support of this argument, Plaintiff relies upon select cases decided before the promulgation of the CMS rules currently in effect and the Supreme Court's recent *Loper* decision. However, as analyzed below, these arguments are without merit. The promulgation of the regulation at issue was based upon the interpretation of EMTALA's statutory language by a variety of federal appellate courts and, today, the CMS regulation remains wholly consistent with EMTALA's purpose and statutory language.

1. Plaintiff's reliance on pre-2000 caselaw is misplaced and unpersuasive.

First, by relying on pre-2000 caselaw, Plaintiff claims that there was a "split" among courts prior to the promulgation of 42 C.F.R. § 489.24 as to the issue of whether EMTALA's obligations end after a patient is admitted, arguing that these pre-2000 cases "present a better construction of EMTALA's specific language." (Opposition, at 7-12.) However, these pre-2000 cases offer little persuasive authority, other than to show, as set forth below, why CMS promulgated the regulation.

The First Circuit case relied upon by Plaintiff, *Lopez-Soto v. Hawayek*, 175 F.3d 170 (1st Cir. 1999) is clearly distinguishable and does not support Plaintiff's claim. There, a pregnant mother presented to a hospital with "normal labor pains" and was admitted, after which, approximately six hours later, she gave birth by cesarian section to a baby who presented with a "medical emergency." *Id.* at 171. Immediately thereafter, the treating pediatrician "determined that the baby required specialized care and began making arrangements to transfer him to a hospital with a functioning neonatal intensive care unit," but then transferred the baby "without first attempting to stabilize the patient or to treat that exigent condition." *Id*. At issue in *Lopez-Soto* was whether EMTALA applied to the hospital's transfer of the baby, who had not "come to" the hospital's emergency department with the mother, "but, rather, had come to the Hospital via the operating room." *Id*. at 172. The First Circuit held that EMTALA's stabilization requirement imposes certain obligations on a hospital "vis-à-vis any victim of a detected medical emergency, regardless of how that person enters the institution or where within the walls he may be when the hospital identifies the problem." *Id*. In other words, "the absence of emergency room presentment does not preclude prosecution of this suit under 42 U.S.C. § 1395dd(b)." *Id*. at 177. In so holding, the court concluded that EMTALA's statutory language was to be read "disjunctively rather than conjunctively." *Id*.

Importantly, *Lopez-Soto* did not involve a patient who had been admitted in good faith for treatment of an emergent condition, and who received treatment for twelve days; rather, as shown above, the infant patient was transferred before *any* treatment was provided. Indeed, the *Lopez-Soto* court recognized that EMTALA was not enacted to create "a federal cause of action for medical malpractice," noting that the district court's concern—that, "without an emergency room arrival limitation, EMTALA might be converted into a federal cause of action for medical malpractice"—was primarily a "temporal" problem. *Id*. at 177 & n.4. To this point, the court noted: "Requiring hospital-wide stabilization of individuals with emergency medical conditions raises the question of how long subsection (b)'s stabilization obligations persist. If stabilization were mandated by EMTALA without limit of time, it might well encroach upon the province of state malpractice law." The court, in citing to *Bryan v. Rectors and Visitors of Univ. of Va*., 95 F.3d 349, 352 (4th Cir.1996), concluded that it had "[left] for another day precisely how" it would deal with this temporal limitation. *Id*. at n. 4. In short, *Lopez-Soto* did not address whether EMTALA's stabilization obligation ended when a patient was admitted.

In contrast, and as Plaintiff concedes, a majority of appellate courts had, as of 2002, interpreted EMTALA's stabilization obligation to terminate upon admission. (Opposition, at 10-11; *see* Motion, at 9-10 (citing, among other cases, *Bryant v. Adventist Health Sys./W*., 289 F.3d 1162, 1168-69 (9th Cir. 2002)) Thus, prior to promulgation of the CMS regulations, there was not "a split in case law," particularly as EMTALA was interpreted and applied in the First Circuit.

2. <u>The CMS regulations are consistent with EMTALA's purpose and statutory language</u>.

Plaintiff relies upon *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) and argues that the Court is not "required to give [the CMS regulations] the deference which courts were once required to accord to administrative regulations." (Opposition, at 13-16.) Specifically, Plaintiff

argues that the promulgation of Section 489.24 added "a restriction" to EMTALA and "exceed[ed] the scope of [CMS's] rule-making authority." (*Id*. at 13.) Although the recent *Loper* decision may have altered the requisite deference a court gives to regulations, in this case, consideration of the CMR regulation is appropriate. The regulation represents the correct interpretation of the law, and it is consistent with the rulings of various courts that have addressed this issue.

To begin, the CMS regulations do not "create a substantive limitation on the scope of EMTALA's applicability which is not found in the statute." (*Id.* at 12.) As Plaintiff concedes, EMTALA is "silent" as to whether a patient's admission to a hospital ends a hospital's EMTALA obligations. (*Id*. at n. 4.) Prior to the enactment of 42 C.F.R. § 489.24, courts routinely examined how a patient's admission affected the EMTALA analysis— the "temporal" problem discussed in *Lopez-Soto, supra*. Numerous appellate courts, prior to 2003, had held that a patient's admission, in good faith, ended a participating hospital's EMTALA obligations. (*See* Motion, at 9-10.) Indeed, when promulgating the final rule at issue, CMS determined that these holdings were the proper and correct interpretation:

> In attempting to resolve the issue about EMTALA applicability to admitted emergency patients, we were assisted by referring to cases in which the courts have had to address the same issue. In several instances, the courts concluded that a hospital's obligations under EMTALA end at the time that a hospital admits an individual to the facility as an inpatient. *See Bryan v. Rectors and Visitors of the University of Virginia*, 95 F.3d 349 (4th Cir. 1996); *Bryant v. Adventist Health Systems/West*, 289 F.3d 1162 (9th Cir. 2002); and *Harry v. Marchant*, 291 F.3d 767 (11th Cir. 2002). In reaching this result, the courts focused on the definition of "to stabilize" set out in the statute at section 1867(e)(3)(A) of the Act. In this definition, the Congress defined this concept by specifically linking the hospital's obligation to provide stabilizing treatment to individuals presenting with emergency medical conditions to the context in which the services are provided.
>
> In particular, the courts found that the statute requires that stabilizing care must be provided in a way that avoids material deterioration of an individual's medical condition if the individual is being transferred from the facility. The courts gave great weight to the fact that hospitals have a discrete obligation to stabilize the condition of an individual when moving that individual out of the hospital to either another facility or to his or her home as part of the discharge process. Thus, should a hospital determine that it would be better to

> admit the individual as an inpatient, such a decision would not result in either a transfer or a discharge, and, consequently, the hospital would not have an obligation to stabilize under EMTALA. The courts have generally acknowledged that this limitation on the scope of the stabilization requirement does not protect hospitals from challenges to the decisions they make about patient care; only that redress may lie outside EMTALA. For example, a hospital may face liability for negligent behavior that results in harm to persons it treat after they are admitted as inpatients, but such potential liability would flow from medical malpractice principles, not from the hospital's obligations under EMTALA.

*Medicare Program; Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals With Emergency Medical Conditions*, 68 Fed. Reg 53,244 (Sept. 9, 2003). Thus, in enacting the regulation at issue, CMS's "reasoning" was not "highly dubious," as Plaintiff suggests. (Opposition, at 16.) Rather, CMS relied upon the interpretation of EMTALA by numerous federal appellate courts as to inpatient admissions, confirming that a patient's good-faith admission for treatment of an emergent condition ended a hospital's EMTALA obligations. Moreover, in the time since CMS promulgated this "inpatient regulation," this Court has found that the "vast majority" of courts have "followed" and applied the regulation.[3] *Walley*, at *3.

Accordingly, even if the Court is no longer obligated to give deference to the CMS regulations and the agency's interpretation of EMTALA, *see Loper*, 603 U.S. at 412 (requiring courts to "exercise their independent judgment"), this Court need only rely on the reasoning of the various cases interpreting EMTALA prior to 2003 (and in the time since), which, in considering EMTALA's language and underlying purpose, concluded that a good faith in-patient admission ended a participating hospital's EMTALA obligations. (*See* Motion, at 8-10 (citing, among other cases, *Bryant, Bryan, and Walley*)).[4] After a good faith admission, a patient is not precluded from seeking relief for negligent care or treatment under State law.

[3] Importantly, for those courts that have relied upon *Chevron* in their interpretation and application of the CMS regulation since 2003, the Supreme Court's *Loper* decision did "not call into question prior cases that relied on the *Chevron* framework." *Loper*, 603 U.S. at 412.

[4] Indeed, it is possible for EMTALA liability to be imposed where a hospital admitted a patient in *bad faith*. *See* 68 Fed. Reg 53,245 ("If it is discovered upon investigation of a specific situation that a hospital

## CONCLUSION[5]

For all of the foregoing reasons, and for those reasons stated in their Motion (ECF No. 6), Defendants respectfully request that the Court dismiss Plaintiff's Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

Dated at Portland, Maine this 27th day of February, 2025.

/s/ *Joseph M. Mavodones*
Joshua D. Hadiaris, Esq. ~ Bar No. 4209
Joseph M. Mavodones, Esq. ~ Bar No. 6454

NORMAN, HANSON & DeTROY, LLC
Two Canal Plaza
P.O. Box 4600
Portland, Maine 04112-4600
(207) 774-7000
*jhadiaris@nhdlaw.com*
*jmavodones@nhdlaw.com*

*Attorneys for Defendants MaineHealth and Maine Medical Center*

---

did not admit an individual in good faith with the intention of providing treatment (that is, the hospital used the inpatient admission as a means to avoid EMTALA requirements), then liability under EMTALA may attach."); *see also Motion*, at p. 10-11 (citing *Walley*, 2018 WL 3614967, at *2 & n. 4; *Grages for Est. of Donovan v. Geisinger Health*, No. 4:19-CV-01141, 2021 WL 880475, at *5 (M.D. Pa. Mar. 9, 2021). Here, however, there is no allegation in the Complaint, nor is there any argument in the Opposition, that MMC admitted Plaintiff in bad faith or solely to satisfy its EMTALA obligation.

Moreover, the Opposition characterizes the CMS regulations as creating a presumption of "good-faith admission," arguing that when "an individual is admitted for stabilizing care in good faith simply does not mean that that individual could never subsequently be discharged before s/he is stabilized." (Opposition, at 16 n. 7.) In such a scenario, however, an individual would be able to seek relief for negligence under State law and would not "den[y] the Plaintiff any opportunity to prove his claim.". (*Id.*; *see supra* p. 1-4.)

[5] Additionally, the Opposition asserts that Plaintiff has now waived his claim brought pursuant 42 C.F.R. § 482.23. (*Complaint*, Count C, ¶¶ 64-76.) As such, Defendants do not address that claim here.

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2025, I electronically filed Defendants' Reply in Support of Motion to Dismiss with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Joseph M. Mavodones*
Joseph M. Mavodones, Esq. ~ Bar No. 6454
Attorney for Defendants

NORMAN, HANSON & DETROY, LLC
Two Canal Plaza, P.O. Box 4600
Portland, ME 04112-4600
(207) 774-7000
*jmavodones@nhdlaw.com*