UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| EDWIN GEORGE DUFFUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:24-cv-00268-SDN |
| | ) | |
| MAINEHEALTH, and | ) | |
| MAINE MEDICAL CENTER, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTION TO DISMISS**

**INTRODUCTION**

The Emergency Medical Treatment and Active Labor Act ("ETMALA") prohibits hospitals from dumping patients with severe medical conditions who require immediate care. If a patient comes to a hospital with an emergency medical condition, the hospital must either provide stabilizing care or transfer the patient to another appropriate medical facility. But the hospital may not discharge the patient before they are stabilized.

Plaintiff Edwin George Duffus sued Maine Medical Center ("MMC") and its parent company, MaineHealth, for violating EMTALA's stabilization and transfer requirements when MMC discharged him after a twelve-day inpatient stay for a stroke. Mr. Duffus alleges that at the time of his discharge the stroke's effects persisted, so he was not stabilized under the statutory definition.

The defendants moved to dismiss, relying on EMTALA's implementing regulation, which provides that a hospital's stabilization obligation is *automatically* satisfied once a patient is admitted to inpatient care. Mr. Duffus argues this regulatory presumption of

1

stabilization for admitted patients is invalid because it conflicts with the statutory stabilization requirement. I agree. The defendants' motion to dismiss is denied.

## FACTUAL BACKGROUND

Edwin George Duffus is a sixty-five-year-old citizen of Jamaica, where he currently resides. ECF No. 1 at 2, ¶¶ 5–6. He is married with four children. *Id.* at 2, ¶ 6. On June 3, 2022, he was admitted to the United States with a temporary work visa pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a), more commonly known as an H-2A visa. *Id.* at 2, ¶ 5. For approximately the next month, he worked on a farm in Warren, Maine. *Id.*

### I.    Mr. Duffus Suffers a Serious Stroke

On the morning of July 17, 2022, Mr. Duffus suffered a hemorrhagic stroke.[1] *Id.* at 3, ¶ 12. He was taken to Pen Bay Medical Center in Rockport, Maine. *Id.* at 3, ¶ 13. There, he was diagnosed with hypertension and an intracerebral hemorrhage.[2] *Id.* at 3, ¶ 14. At that point, recognizing Pen Bay did not have adequate facilities to treat Mr. Duffus, an emergency physician at Pen Bay contacted MMC and requested to transfer Mr. Duffus. *Id.* MMC agreed to accept Mr. Duffus. *Id.* at 3, ¶ 15.

LifeFlight of Maine helicoptered Mr. Duffus to MMC, arriving at 11:19 a.m. on July 17, 2022. *Id.* at 3, ¶ 16. MMC determined Mr. Duffus presented in serious condition. He suffered "acute symptoms of sufficient severity" such that the "absence of immediate medical attention could reasonably be expected to place his health in serious jeopardy, result in serious impairment to his bodily functions," or "result in serious dysfunction of a bodily organ or part." *Id.* at 3, ¶ 17. At some point on July 17, MMC admitted Mr. Duffus

---

[1] A hemorrhagic stroke is a particular type of severe stroke resulting from the rupture of a blood vessel in the brain.

[2] An intracerebral hemorrhage is another word for a hemorrhagic stroke. *See cerebral hemorrhage*, Stedmans Medical Dictionary 402240 ("[a] hemorrhage into the substance of the cerebrum").

to its neurocritical care unit. *Id.* at 3, ¶ 18. He remained admitted as an inpatient until his discharge twelve days later.[3]

Doctors identified severe hypertension as the cause of Mr. Duffus's intracerebral hemorrhage. *Id.* at 3, ¶ 20. He suffered from "right side hemiparesis, aphasia, hypomimia, hypophonia, dysarthria, decreased balance and decreased activity tolerance." *Id.* During his stay at MMC, Mr. Duffus's hypertension improved only slightly. When he was first admitted on July 17, 2022, Mr. Duffus's blood pressure was around 135/67 to 198/100. *Id.* at 4, ¶ 22. His blood pressure reached a high of 174/101 during his stay and read 157/90 on the day before MMC discharged him. *Id.*

Mr. Duffus's performance in occupational and physical therapy likewise improved only marginally. Under a standardized scoring system, Mr. Duffus's occupational therapy score improved from 27.31 to 32.03 from July 18, 2022, to July 28, 2022. *Id.* at 4–5, ¶ 24. A score over 39.4 would indicate a patient is "more likely to be able to return home," while a lower score, like Mr. Duffus's, would indicate the need for rehabilitation. *Id.* Under another standardized scoring system, Mr. Duffus's physical therapy score improved from 19.39 to 32.33 over the same period. *Id.* On that scale, a score of 42.9 would indicate a patient could return home while a lower score, like Mr. Duffus's, would indicate the need for rehabilitation. *Id.*

---

[3] The medical field distinguishes between treatment on an "inpatient" and "outpatient" basis. An "outpatient" stays at a hospital or medical facility only temporarily. Generally speaking, treatment in an emergency department is considered "outpatient" treatment, even if it occurs at a hospital facility. On the other hand, an "inpatient" is a patient who has been "admitted" to the hospital, where they are expected to stay for a longer period, usually overnight or for more than twenty-four hours.

The precise legal definition of these terms is far more complex. *See* 42 U.S.C. 1395x; 42 C.F.R. § 409.10 (2025). However, neither party here disputes that MMC admitted Mr. Duffus as an inpatient.

Medical records demonstrate Mr. Duffus's care team knew of the severity of his condition and his need for continued rehabilitation care. On July 22, 2022, one therapist noted that Mr. Duffus would "be an excellent acute rehab candidate." *Id.* at 4, ¶ 23. A note in his record from July 23, 2022, stated that Mr. Duffus was "critically ill with ICH,[4] hypertension [requiring] infusion, and at risk for neurological, cardiac, [and] metabolic decompensation." *Id.* at 3, ¶ 20 (first alteration in original). On July 28, 2022, the day before MMC discharged Mr. Duffus, another therapist noted that Mr. Duffus "would benefit from increased time here prior to taking a flight back to Jamaica to improve strength and balance." *Id.* at 4, ¶ 23. While some medical records contain statements suggesting Mr. Duffus was ready to travel by plane when he was discharged, other medical records contradict that conclusion. *Id.* at 5, ¶ 25. For example, at the time of his discharge, Mr. Duffus could not "travel without substantial assistance, was still suffering from significant difficulty in speaking, [was] unable to perform physical motions needed to move himself," and was unable to "use an airline toilet or even feed himself." *Id.*

## II.    MMC Discharges Mr. Duffus

Before MMC discharged Mr. Duffus, he "consistently expressed [to his providers at MMC] his desire to continue treatment in Maine rather than be discharged and immediately returned to Jamaica." *Id.* at 5, ¶ 26. Mr. Duffus's family made similar requests to MMC. *Id.* at 5, ¶ 27.

Nevertheless, at 2:00 a.m. on July 29, 2022, MMC discharged Mr. Duffus to the custody of the Jamaica Central Labour Organisation ("JCLO").[5] *Id.* at 6, ¶ 28. MMC did

---

[4] "ICH" likely refers to intracerebral hemorrhage.

[5] The JCLO is a Jamaican government agency tasked with facilitating Jamaican H-2A visa holders' employment in the United States, as well as "monitoring their welfare." ECF No. 1 at 6, ¶ 28.

not refer Mr. Duffus to acute rehabilitation, despite a recommendation from his care team. *Id*. at 6, ¶ 29. MMC chose not to issue a referral because Mr. Duffus did not have health insurance and MMC believed he was ineligible for either MaineCare[6] or other financial assistance from MMC. *Id*.

In fact, Mr. Duffus was eligible to apply for health insurance under the Affordable Care Act throughout the entire duration of his stay at MMC, but he did not know this and MMC never told him. *Id*. at 6, ¶¶ 30–31. That insurance would have covered acute rehabilitation. *Id*. ¶ 30.

MMC also never told the Maine Mobile Health Program ("MMHP"), a program which provides health care services to migrant farm workers, that MMC planned to discharge Mr. Duffus. *Id*. at 7, ¶ 35. Multiple MMHP staff, including Dr. Demetri Blanas, its medical director, had contacted MMC during the course of Mr. Duffus's stay, hoping to help him and "intending to offer assistance in meeting [his] medical and financial needs." *Id*. After hearing from the JCLO on July 28, 2022, about Mr. Duffus's imminent discharge, Dr. Blanas attempted to contact "a responsible person" at MMC to "discuss the medical appropriateness" of discharging Mr. Duffus and to offer help in finding financial support for Mr. Duffus. *Id*. at 7–8, ¶¶ 36–37. MMC did not respond to Dr. Blanas. *Id*. at 7–8, ¶ 37. The Complaint alleges that one MMC nurse "laughed at Dr. Blanas and another nurse hung up on him." *Id*.

Ultimately, Mr. Duffus consented to his own discharge. However, he claims MMC "constructively coerced" him to do so. *Id*. at 8, ¶ 40. MMC providers told him that "he

---

[6] MaineCare is a state program that "provides free and low-cost health insurance to Mainers who meet certain requirements, based on household composition and income." *Health Care Assistance*, State of Me. Dep't of Health and Hum. Servs., https://perma.cc/BYK4-GS4K.

could not remain at MMC and that he could not be sent to the acute rehabilitation recommended by his care team because he had no insurance." *Id.* at 8–9, ¶ 40.

Because MMC refused to transfer Mr. Duffus to acute rehabilitation, his only choice was to either return to the labor camp where he worked as a farmer—without adequate facilities to support someone in Mr. Duffus's state—or to fly home to Jamaica. *Id.* at 7, ¶ 33. Accordingly, JCLO arranged to help fly Mr. Duffus to Jamaica upon discharge. *Id.* at 7, ¶ 34. JCLO asked MMC to provide an ambulance to transport Mr. Duffus to the airport, but MMC refused. *Id.* at 9, ¶ 41. Instead, two JCLO representatives (neither one a medical professional) met Mr. Duffus at MMC when he was discharged at 2:00 a.m. and "with great difficulty" helped him into a taxi, brought him to the airport, and placed him on the plane. *Id.* at 9, ¶ 41.

When Mr. Duffus arrived in Jamaica, several family members met him at the airport. He appeared "very weak and obviously very ill; he was unable to sit up[,] he had not eaten[,] and his diaper had not been changed. They likened his condition to that of a baby." *Id.* at 9, ¶ 43.

Though MMC employees had spoken with staff at an acute rehabilitation facility in Jamaica prior to Mr. Duffus's discharge, the MMC employees did not further facilitate treatment after Mr. Duffus left the hospital, resulting in an eighteen-day lapse in Mr. Duffus's care. *Id.* at 10, ¶ 44. Over that period, Mr. Duffus's condition worsened: "[He] was bedridden and fully impaired, unable to speak clearly, unable to move without assistance[,] and unable to feed himself." *Id.* at 10, ¶ 45. When he finally had his first therapy session in Jamaica on August 15, 2022, he relapsed, "collapsed, and required immediate medical attention," causing "serious and lasting harm." *Id.* at 10, ¶ 46.

## PROCEDURAL HISTORY

Mr. Duffus sued MMC and MaineHealth (a medical provider network and parent corporation of MMC) on July 25, 2024. ECF No. 1. MMC and MaineHealth moved to dismiss. ECF No. 6. Mr. Duffus responded, and the defendants replied. ECF Nos. 11, 14. The Court held oral argument on the motion on June 24, 2025.

Mr. Duffus levies two claims against MMC and MaineHealth. First, Mr. Duffus alleges in Claim A that MMC failed to stabilize him in violation of EMTALA. ECF No. 1 at 10–12. Second, Mr. Duffus alleges in Claim B that MMC unlawfully transferred him in violation of the same statute. *Id*. at 12–13. Mr. Duffus also initially raised a claim based on a violation of certain regulations, *id*. at 13–15, but he has since dropped that claim. ECF No. 11 at 20 ("The Plaintiff waives his claim that MMC violated 42 C.F.R. § 482.43.").

## THE STATUTORY SCHEME

### I.    EMTALA

In the mid-1980s, as "health-care costs spiralled upward and third-party payments"—that is, payments made by insurance instead of by a patient directly— "assumed increased importance" to hospitals' bottom lines, anecdotal reports emerged of critically ill patients turned away at the emergency room door. *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1189 (1st Cir. 1995). In short, some hospitals were refusing to treat poor, uninsured patients, including people who were critically ill and women in labor. Some hospitals rejected such patients as a matter of course; others involuntarily transferred such patients to public facilities after discovering their lack of insurance.

Enter EMTALA. *See* Consolidated Omnibus Budget Reconciliation Act of 1985, Pub. L. No. 99-272, § 9121, 100 Stat. 82, 164 (codified as amended at 42 U.S.C. § 1395dd). EMTALA has three essential provisions. First, it requires a hospital to screen any person

who arrives at the emergency department requesting care. 42 U.S.C. § 1395dd(a). The screening must consist of "an appropriate medical . . . examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department," to determine whether the patient has an "emergency medical condition." *Id.*

Second, if the hospital determines any person who "comes to a hospital" has an "emergency medical condition," the hospital must either stabilize the patient or transfer the patient to another appropriate medical facility.[7] *Id.* § 1395dd(b)(1). To stabilize the patient, the hospital must provide "for such further medical examination and such treatment as may be required to stabilize the medical condition." *Id.* § 1395dd(b)(1)(A).

Third, if the hospital seeks to transfer the patient to another appropriate medical facility instead of providing stabilizing care directly, EMTALA imposes strict guidelines. In fact, the background rule is that a hospital may *not* transfer a patient with "an emergency medical condition which has not been stabilized." *Id.* § 1395dd(c)(1). Two requirements must be met to permit a transfer. First, a physician (or, if a physician is unavailable, another qualified medical person) must certify in writing that "the medical benefits reasonably expected from the provision of appropriate medical treatment at another medical facility outweigh the increased risks to the individual . . . from effecting the transfer."[8] *Id.* § 1395dd(c)(1)(A)(ii)–(iii). Second, the transfer must be an "appropriate transfer." *Id.* § 1395dd(c)(1)(B).

---

[7] A hospital satisfies its obligations under EMTALA if the patient refuses treatment or refuses an offer of appropriate transfer. 42 U.S.C. § 1395dd(b)(2)–(3).

[8] Many sections of the statute also include clauses clarifying how the rules apply to pregnant women in labor. *E.g.*, 42 U.S.C. § 1395dd(c)(1)(A)(ii) (physician must consider "increased risks to the individual and, in the case of labor, to the unborn child from effecting the transfer"). For the sake of clarity and because

What constitutes an appropriate transfer likewise is strictly defined. The *transferring* hospital must provide "medical treatment within its capacity which minimizes the risks to the individual's health." *Id.* § 1395dd(c)(2)(A). The *receiving* facility must have space available, must have "qualified personnel" to treat the patient, and must "agree[] to accept transfer" of the patient and "provide appropriate medical treatment." *Id.* § 1395dd(c)(2)(B). The transferring hospital must send the receiving facility all relevant medical records. *Id.* § 1395dd(c)(2)(C). And the transfer must be "effected through qualified personnel and transportation equipment." *Id.* § 1395dd(c)(2)(D).

EMTALA defines the words "to stabilize" and "stabilized" as follows:

> (A) The term "to stabilize" means, with respect to an emergency medical condition . . . , to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . .

> (B) The term "stabilized" means, with respect to an emergency medical condition . . . , that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility . . . .

*Id.* § 1395dd(e)(3)(A)–(B).

## II.    Implementing Regulation

Federal law authorizes the Department of Health and Human Services' Centers for Medicare and Medicaid Services ("CMS") to promulgate regulations implementing EMTALA. *See* 42 U.S.C. §§ 1302, 1395dd, 1395hh. CMS did so, creating a regulation that implements the stabilization requirement.

---

they are not directly relevant to Mr. Duffus's claim, I have omitted most of those parts of the statute in this analysis.

The regulation roughly tracks the statutory provision. When a patient presents to an emergency room, the hospital must provide an "appropriate medical screening examination within the capability of the hospital's emergency department . . . to determine whether or not an emergency medical condition exists." 42 C.F.R. § 489.24(a)(1)(i) (2025). If the patient has an emergency medical condition, the hospital must either "provide any necessary stabilizing treatment, as defined in paragraph (d) of this section, or an appropriate transfer as defined in paragraph (e) of this section." *Id*. § 489.24(a)(1)(ii).

While the "appropriate transfer" rules of paragraph (e) are consistent with the statutory provisions, *id*. § 489.24(e), the stabilization requirement of paragraph (d) carves out a significant exception to the requirement not present in the statute itself: if the hospital screens a patient and finds the patient has an emergency medical condition—which would otherwise trigger the *statutory* stabilization requirement—the hospital satisfies its stabilization obligation under the *regulation* if it "admits that individual as an inpatient in good faith in order to stabilize the emergency medical condition." *Id*. § 489.24(d)(2)(i). In other words, under the regulation a hospital satisfies its obligation to stabilize whether or not it actually stabilizes a patient who presents with an emergency medical condition so long as the hospital admits the patient as an inpatient in a good faith attempt to stabilize the patient. However, the statute itself provides no such exception to the stabilization requirement.

The historical development of the regulation provides some insight into this deviation from the statutory text. In the 1990s and early 2000s, before CMS finalized its regulation, multiple courts addressed the question of when EMTALA's requirements apply.

The Fourth Circuit held that EMTALA's stabilization requirement applies only "in the immediate aftermath of the act of admitting [a patient] for emergency treatment." *Bryan v. Rectors & Visitors of Univ. of Va.*, 95 F.3d 349, 352 (4th Cir. 1996). In that case, the plaintiff presented to a hospital with emergency respiratory distress. The hospital provided stabilizing treatment as EMTALA requires, but after twelve days (and against the family's wishes) the hospital entered a do not resuscitate order and the patient died a week later. *Id.* at 350. The Fourth Circuit rejected the argument that "the hospital's abandonment of . . . treatment" violated EMTALA. *Id.*

The court relied on both the legislative history and the statutory text to arrive at that conclusion. In the court's view, shared by numerous other courts of appeals, "Congress's sole purpose in enacting EMTALA was to deal with the problem of patients being turned away from emergency rooms for non-medical reasons."[9] *Id.* at 351; *see also Correa*, 69 F.3d at 1189; *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 268 (6th Cir. 1990). However, if the stabilization requirement continued indefinitely, then a "hospital would have to provide treatment indefinitely—perhaps for years—according to a novel, federal standard of care derived from the statutory stabilization requirement." *Bryan*, 95 F.3d at 351. That reading of the statute, the Fourth Circuit explained, is not "plausible" in light of Congress's intent, so the court concluded the stabilization requirement must be temporally limited. *Id.*

---

[9] Other courts of appeals addressed EMTALA's purpose in the context of its other requirements. For example, the Eighth Circuit considered Congress's intent not to create a general federal malpractice statute in determining whether a patient "was afforded an 'appropriate' medical screening examination" under EMTALA's screening requirement. *Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir. 1996); *see also Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994) (similar).

The Fourth Circuit saw the limited legislative purpose further reflected in EMTALA's definition of "to stabilize." *See* 42 U.S.C. § 1395dd(e)(3)(A) (defining "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur *during the transfer of the individual from a facility*" (emphasis added)). By defining the stabilization requirement "entirely in connection with a possible transfer," EMTALA suggests it does not regulate "outside that narrow context" when the hospital takes in a patient for emergency treatment and "consider[s] whether it would undertake longer-term full treatment or instead transfer the patient to [another] hospital."[10] *Bryan*, 95 F.3d at 352.

While the Fourth Circuit delineated EMTALA's temporal boundary by reference to the "the immediate aftermath" of a patient presenting to the hospital for an emergency medical condition, *id.*, other courts crafted a bright-line rule.[11] The Ninth Circuit, relying on the same reasoning as the Fourth Circuit in *Bryan*, held that a hospital's stabilization obligation ends when a patient is admitted to inpatient care. *Bryant v. Adventist Health Sys./W.*, 289 F.3d 1162, 1168 (9th Cir. 2002); *see also Scott v. Hutchinson Hosp.*, 959 F. Supp. 1351, 1359 (D. Kan. 1997) (concluding the same). However, concerned that a strict rule could permit hospitals to evade their stabilization obligations by admitting a patient in bad faith, the Ninth Circuit created a narrow exception: if a plaintiff shows "in a

---

[10] Similarly, in *Harry v. Marchant*, the Eleventh Circuit held that a patient who died within a day after arriving in the emergency room could not sue under EMTALA's stabilization requirement because she was never actually transferred out of the hospital. 291 F.3d 767, 768 (11th Cir. 2002).

[11] While the district court in *Bryan* also relied on a bright-line rule that a hospital's EMTALA stabilization obligation ends upon admission to inpatient care, the Fourth Circuit did not affirm on those grounds. *Bryan*, 95 F.3d at 350.

particular case that inpatient admission was a ruse to avoid EMTALA's requirements, then liability under EMTALA may attach." *Bryant*, 289 F.3d at 1169.

The Sixth Circuit concluded otherwise. It held that a hospital's stabilization obligation extends until the patient's emergency medical condition is stabilized, whenever that may occur. *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1135 (6th Cir. 1990); *see Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573, 581–82 (6th Cir. 2009) (explaining *Thornton* followed a plain reading of the statutory language). As the court explained, EMTALA's stabilization requirement requires "a hospital to treat a patient with an emergency condition in such a way that, upon the patient's release, no further deterioration of the condition is likely." *Moses*, 561 F.3d at 582. It would be "unreasonable to believe that such treatment could be provided by admitting the patient and then discharging" them. *Id*. After all, changing a patient's administrative status from outpatient to inpatient does not treat their medical condition. Therefore, "the statute requires more than the admission and further testing of a patient; it requires that actual care, or treatment, be provided as well." *Id*. Tying the stabilization requirement to actual treatment prevents hospitals from "circumvent[ing] the requirements of [EMTALA] merely by admitting an emergency room patient to the hospital, then immediately discharging that patient." *Thornton*, 895 F.2d at 1135.

The First Circuit came to a similar conclusion in *Lopez-Soto v. Hawayek*, 175 F.3d 170 (1st Cir. 1999). In *Lopez-Soto*, the First Circuit considered a hospital's EMTALA stabilization obligation to a baby born to a mother who was an inpatient at the time she gave birth. The district court had concluded that EMTALA's three principal requirements—the duty to screen, the duty to stabilize, and the restrictions on transfer—must be read together such that they only apply to a patient who presents to the

emergency room in the first instance. *Id*. at 172. The First Circuit disagreed. The statutory language "unambiguously imposes certain duties on covered hospitals vis-à-vis *any* victim of a detected medical emergency, regardless of how that person enters the institution or where within the walls [they] may be when the hospital identifies the problem." *Id*. at 173. That is because the stabilization requirement applies to any patient who "comes to a hospital," while the statutory screening requirement applies only to a patient who "comes to the emergency department." 42 U.S.C. § 1395dd(a)–(b). The statute's use of a broader prerequisite phrase suggested to the First Circuit that the stabilization requirement must apply more broadly. Accordingly, the First Circuit held that "the absence of emergency room presentment" did not eliminate a hospital's EMTALA obligation to stabilize a baby born on an inpatient unit. *Lopez-Soto*, 175 F.3d at 177. While *Lopez-Soto* addressed only whether EMTALA's stabilization obligations apply in the first instance—and did not decide if and when those obligations terminate—it rejected a bright-line rule that EMTALA's obligations do not apply to inpatients.

Against this backdrop of cases, CMS proposed its rule interpreting ETMALA's stabilization requirement in 2002. Under the proposed rule, when "medical judgment . . . dictate[s] that a patient be admitted to the hospital for further treatment on an inpatient basis because the patient's emergency medical condition has not yet been stabilized," the hospital's stabilization obligation under EMTALA continues "irrespective of the inpatient admission." *Medicare Program; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2003 Rates*, 67 Fed. Reg. 31404, 31475 (May 9, 2002) (proposed rule). Therefore, "admission to inpatient status [could not] be used to evade EMTALA responsibilities." *Id*. Echoing the Sixth Circuit, CMS explained that a contrary rule "would provide an obvious means of circumventing [EMTALA's]

requirements that would seemingly contradict the point of the statute to protect emergency patient health and safety." *Id.*

During the notice and comment period, CMS received "extensive negative public comments" on its proposed rule. *Walley v. York Hosp.*, No. 18-cv-126, 2018 WL 3614967, at *3 (D. Me. July 27, 2018). Accordingly, CMS reversed its position, adopting a final rule similar to the Ninth Circuit's standard. *See Medicare Program; Clarifying Policies Related to the Responsibilities of Medicare-Participating Hospitals in Treating Individuals with Emergency Medical Conditions*, 68 Fed. Reg. 53222, 53244 (Sept. 9, 2003) (codified at 42 C.F.R. § 489.25).

The final CMS rule provided that "a hospital's obligations under EMTALA end once an individual is admitted for inpatient care." 68 Fed. Reg. at 53248. However, recognizing the possibility that a hospital could attempt to circumvent the stabilization requirement by "ostensibly 'admitting' a patient, with no intention of treating the patient, and then inappropriately transferring or discharging the patient without having met the stabilization requirement," *id.* at 53245, the final rule added a "good faith" requirement. That is, a hospital satisfies its stabilization requirement under the final CMS rule when it admits a patient to inpatient care "in good faith in order to stabilize the emergency medical condition." 42 C.F.R. § 489.24(d)(2)(i).

CMS justified its reversal from the initial proposed rule by referencing the Fourth and Ninth Circuits' opinions in *Bryan* and *Bryant. Id.* at 53244 (citing *Bryan*, 95 F.3d 349; and *Bryant*, 289 F.3d 1162). In CMS's view, it was "appropriate to pay deference" to what it characterized as "consistent judicial interpretation of the matter." *Id.* at 53245.

At the same time, CMS acknowledged that judicial interpretation of EMTALA's requirements was anything but consistent, distinguishing its rule from the First Circuit's

holding in *Lopez-Soto*.[12] According to CMS, because *Lopez-Soto* was unclear about the inpatient status of the baby in that case, the First Circuit's decision did not conflict with the final rule. 68 Fed. Reg. at 53246. Although the newborn was born to an inpatient mother on an inpatient ward, conceivably the baby itself was not an inpatient. If the baby was not inpatient, then *Lopez-Soto* cannot stand for the proposition that a hospital has EMTALA stabilization obligations to inpatients. However, CMS conceded that if the baby *was* an inpatient, then "the [First Circuit's] holding would be inconsistent with the views adopted in th[e] final rule." *Id*.

### III.    Some Courts Defer to the CMS Regulation

The CMS regulation, as promulgated in the final rule, went into effect in 2003. At the time, courts usually applied the *Chevron* framework to determine whether or not to defer to an agency's interpretation of a statute. *See generally Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Most courts faced with EMTALA stabilization cases after 2003—including those in the First Circuit—did so and deferred to the CMS regulation. *See Thornhill v. Jackson Par. Hosp.*, 184 F. Supp. 3d 392, 399 (W.D. La. 2016) (gathering district court cases and concluding the "vast majority of courts . . . have given the regulations controlling weight, or have cited them in support of finding that a hospital's duty under EMTALA ends upon admitting a patient in good faith"); *Ceballos-Germosen v. Doctor's Hosp. Ctr. Manati*, 62 F. Supp. 3d 224, 231–32 (D.P.R. 2014).

This Court applied the CMS regulation as recently as 2018, finding a plaintiff did not have a cause of action for failure to stabilize under EMTALA where the hospital admitted her as an inpatient after she presented to the emergency department with a

---

[12] CMS did not distinguish the final rule from the Sixth Circuit's holding in *Thornton v. Sw. Detroit Hosp.*, 895 F.2d 1131, 1135 (6th Cir. 1990).

stroke. *Walley*, 2018 WL 3614967, at \*3. In that case, however, the Court applied the CMS regulation but declined to "engage in the conventional *Chevron* analysis" because the plaintiff did not challenge the regulation's validity. *Id.*

However, the Sixth Circuit has continued to disagree with any rule that ends EMTALA's stabilization requirement on inpatient admission. In *Moses v. Providence Hosp. & Med. Ctrs., Inc.*, 561 F.3d 573 (6th Cir. 2009), the court considered whether a "hospital's decision to admit [a patient] for six days and perform further testing satisfied its obligations under EMTALA to treat so as to stabilize the patient." *Id.* at 582. Because the CMS regulation had not yet gone into effect when the cause of action initially arose, the Sixth Circuit followed its pre-regulation precedent in *Thornton* and reaffirmed its conclusion that admission does not automatically satisfy EMTALA's stabilization requirement. *Id.* (citing *Thornton*, 895 F.2d at 1135). In its decision, the court opined on the CMS regulation's validity and declined to give it any deference: "The CMS rule appears contrary to EMTALA's plain language . . . . [I]t is unreasonable to believe that 'treatment as may be required to stabilize' [as the statute requires] could mean simply admitting the patient and nothing further." *Id.* at 583.

## IV.    *Loper Bright*

The Supreme Court overruled *Chevron* in 2024. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("Chevron is overruled."). Courts may no longer "mechanically afford *binding* deference to agency interpretations." *Id.* at 399. Therefore, I must decide what, if any, deference to give to the CMS regulation. To do so, I take a brief detour through the new administrative law landscape.

An agency can only wield power Congress confers. *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986) (explaining "an agency literally has no power to act"

17

absent congressional authorization). Accordingly, Congress often tasks agencies with implementing statutes. *See Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) ("In many cases . . . the statute gives an agency broad power to enforce all provisions of the statute."). However, when a statute is ambiguous, it can be hard to glean Congress's intent. As Justice Scalia once put it, there are two options for interpreting ambiguous statutes: "(1) Congress intended a particular result, but was not clear about it; or (2) Congress had no particular intent on the subject, but meant to leave its resolution to the agency." Antonin Scalia, *Judicial Deference to Administrative Interpretations of Law*, 1989 Duke L.J. 511, 516.

*Chevron* created a judicial presumption that the second option was always the case. *See id.* If Congress left ambiguities in a statute, it meant that Congress actually intended for an agency—not a court—to clear them up. *Chevron* operationalized this presumption with a two-step process. At *Chevron* step one, courts "first assess[ed] 'whether Congress has directly spoken to the precise question at issue.' If . . . congressional intent is 'clear,' that is the end of the inquiry." *Loper Bright*, 603 U.S. at 379 (quoting *Chevron*, 467 U.S. at 842). But if the statute was "'silent or ambiguous with respect to the specific issue' at hand," courts would proceed to step two. *Id.* (quoting *Chevron*, 467 U.S. at 842). At *Chevron* step two, courts were required to defer to an agency's interpretation of the statute, so long as that interpretation was reasonable. *Id.*

When it overruled *Chevron*, *Loper Bright* eliminated the second step and rejected *Chevron*'s "across-the-board presumption" that ambiguity confers agency discretion. *See O'Brien v. Lowell Gen. Hosp.*, 749 F. Supp. 3d 209, 215–16 (D. Mass. 2024) ("Effectively, *Loper* overrules what had in common parlance been called '*Chevron* step two . . . .'"). To be sure, Congress may still authorize an agency to exercise regulatory discretion; indeed,

18

if an agency could *never* exercise discretion in some measure, every regulation would simply restate the authorizing statute verbatim. For example, Congress may expressly delegate "the authority to give meaning to a particular statutory term[,] . . . to prescribe rules to 'fill up the details' of a statutory scheme, or to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility.'" *Loper Bright*, 603 U.S. at 395 (citations omitted) (first quoting *Wayman v. Southard*, 23 U.S. 1, 44 (1825); and then quoting *Michigan v. E.P.A.*, 576 U.S. 743, 752 (2015)); *see, e.g.*, *Sutherland v. Peterson's Oil Serv., Inc.*, 126 F.4th 728, 739 n.5 (1st Cir. 2025) (finding a statute that authorizes agency "to issue regulations implementing the definitions of disability . . . including rules of construction" is a "quintessential example" of a permissible delegation under *Loper Bright*). Under *Loper Bright*, express authority is the name of the game: congressional silence is no longer an invitation for regulatory discretion. Absent clear statutory authorization, courts cannot presume Congress intended for an agency to fill statutory gaps or interpret statutory ambiguities. *See Loper Bright*, 603 U.S. at 404.

Nonetheless, while *Chevron* step two is gone, step one, affirming the longstanding principle that courts interpret statutes according to their plain meaning, remains. *Strickland v. Comm'r, Me. Dep't of Hum. Servs.*, 48 F.3d 12, 16 (1st Cir. 1995); *O'Brien*, 749 F. Supp. 3d at 16. After *Loper Bright*, courts must continue to operate within the "traditional understanding of the judicial function, under which courts must exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright*, 603 U.S. at 394. Sometimes, as a limited tool of statutory interpretation at step one, courts may still "seek aid" from regulations that "constitute a body of experience and informed judgment." *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). But

courts may not "mechanically" defer to reasonable regulations, as *Chevron* formerly required. *Id.* at 399.

If, having deciphered a statute's plain meaning, a court finds the "best reading of [the] statute is that it delegates discretionary authority to an agency," *Loper Bright* mandates a new three-step process. *Id.* at 395; *see Moctezuma-Reyes v. Garland*, 124 F.4th 416, 420 (6th Cir. 2024) ("If we're confronted with one of these statutes that has such express language conferring discretion on the agency to interpret a broad standard, *Loper Bright* explains that our job is threefold."). The Sixth Circuit summarized it succinctly: "First, we independently determine the scope of Congress's delegation of authority to the agency. Second, we ensure the delegation doesn't violate the Constitution. And third, we determine whether the agency's interpretation stays within the scope of the delegation." *Moctezuma-Reyes*, 124 F.4th at 420 (citations omitted) (citing *Loper Bright*, 603 U.S. at 395). In other words, courts must "identify . . . such delegations of authority" where they actually exist—rather than inferring delegations from congressional silence— and "police [the delegations'] outer statutory boundaries." *Loper Bright*, 603 U.S. at 404.

## THE PARTIES' ARGUMENTS

The defendants argue Mr. Duffus's claims fail because MMC admitted Mr. Duffus as an inpatient in good faith. Therefore, under the CMS regulation, MMC satisfied its stabilization obligation under EMTALA, whether or not the care MMC ultimately provided to Mr. Duffus as an inpatient was adequate. If the care was inadequate, Mr. Duffus could recover only under a standard medical malpractice theory, not under EMTALA. In addition, because MMC adequately stabilized Mr. Duffus under the CMS regulation by admitting him as an inpatient, the defendants argue MMC did not violate EMTALA's transfer provision.

In the defendants' view, the CMS regulation represents a "correct interpretation" of EMTALA because they "limit EMTALA to what it is intended to be: an anti-dumping statute." ECF No. 6 at 12. If EMTALA's stabilization requirement continued to apply even after a lengthy inpatient hospitalization, EMTALA essentially would turn into a broad medical malpractice statute rather than the narrow anti-dumping statute Congress intended.

Mr. Duffus responds that the CMS regulation is invalid insofar as it limits EMTALA's stabilization requirement to only unadmitted patients. In Mr. Duffus's view, EMTALA's plain language—as construed by the First Circuit in *Lopez-Soto* before CMS promulgated its regulation—demonstrates the stabilization requirement applies even after a patient is admitted to inpatient care. *See Lopez-Soto*, 175 F.3d 170. Because an agency lacks Congressional authority to promulgate a regulation that conflicts with the statute it purports to implement, and, in Mr. Duffus's view, the CMS regulation conflicts with EMTALA, Congress could not have intended to authorize CMS to create such a regulation. Therefore, CMS lacked authority to issue the regulation and the Court should not defer to the regulation's interpretation of the stabilization rule. Therefore, Mr. Duffus seeks to remove what he calls the CMS regulation's "irrebuttable presumption[]" of stabilization once a hospital admits a patient in good faith.

Mr. Duffus also argues this case is distinguishable from other cases in which courts read the stabilization requirement in light of the transfer provisions, and therefore did not apply the stabilization requirement to patients who were admitted and never transferred. Here, Mr. Duffus was actually transferred, and actually suffered material harm as a result.

21

The defendants reply that the CMS regulation does not conflict with EMTALA because EMTALA is silent as to whether a patient's admission to inpatient care ends a hospital's stabilization obligation. Indeed, as CMS noted in its final rule, some courts had already interpreted EMTALA itself as imposing the same temporal limitations on the stabilization obligation that the CMS regulation ultimately codified.

Finally, the defendants maintain that all the relief Mr. Duffus seeks is available under state law. Because EMTALA was not intended to supplant state medical malpractice law, the defendants reiterate that applying EMTALA here would convert EMTALA into a federal malpractice statute that Congress did not intend to create.

## DISCUSSION

### I.    Applying *Loper Bright*'s Framework to the CMS Regulation

This section discusses whether the CMS stabilization and transfer regulation is valid. This analysis essentially is dispositive: if the regulation is valid and I apply it to this case, Mr. Duffus's claim must fail because he was admitted as an inpatient; if not, Mr. Duffus's claim should survive this motion to dismiss because he plausibly alleges MMC failed to stabilize him within the meaning of the statute.

*Loper Bright* envisions a sliding scale of agency authority. On one end of the spectrum, when Congress explicitly authorizes an agency to define a specific term, or to exercise judgment on a narrow question, "effectuat[ing] the will of Congress" only requires a court to "ensur[e] the agency has engaged in 'reasoned decisionmaking' within [the statutory] boundaries." 603 U.S. at 395. For example, Congress could write a statute requiring nuclear facilities to send a report to the Nuclear Regulatory Commission whenever there is a "substantial safety hazard, as defined by regulations which the Commission shall promulgate." *Loper Bright*, 603 U.S. at 395 n.5 (quoting 42 U.S.C.

§ 5846(a)(2)). In that case, the Commission could obviously promulgate regulations defining "substantial safety hazard," because Congress told it to. When Congress delegates narrow authority to an agency, the agency can wield it with maximum power.

On the other end of the spectrum, when Congress does not authorize *any* agency action, an unauthorized regulation "is ultra vires and violates the Administrative Procedure Act." *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (citation omitted); *see La. Pub. Serv. Comm'n*, 476 U.S. at 357 (explaining "an agency literally has no power to act" absent congressional authorization). For example, after Congress passed a law providing "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," 28 U.S.C. § 1331, no agency could issue a regulation defining the meaning of "civil actions" or establishing monthly reporting requirements under the statute. Congress simply did not authorize any agency to do anything at all related to the statute.

Towards the center of the spectrum are statutes where Congress generally authorizes an agency to implement a statute but provides no specifics. These are the "fill up the details" types of statutory authority. *Loper Bright*, 603 U.S. at 395. In such a case, the agency must be able to do *something*, otherwise the statutory authorization for agency action would be meaningless. But the agency cannot define specific terms; otherwise, statutes that expressly provide for agency definition would be superfluous. Instead, the statutory authority to "fill up the details," *id*., permits agencies to regulate within the gaps Congress leaves. However, an agency cannot rely on only a broad delegation to regulate in places Congress has already spoken by defining or interpreting congressional language. EMTALA is such a statute.

## A. Congressional Delegation under EMTALA

### 1. *General Delegations*

EMTALA is codified in Chapter 7, Subchapter XVIII of Title 42 of the United States Code. *See* 42 U.S.C. § 1395dd. Section 1302 of Chapter 7 permits the Secretary of Health and Human Services to "make and publish such rules and regulations, not inconsistent with this chapter, as may be necessary to the efficient administration of the functions with which [the Secretary] is charged under this chapter." *Id.* § 1302(a). Section 1395hh, which sits within Subchapter XVIII, further authorizes the Secretary to "prescribe such regulations as may be necessary to carry out the administration of the insurance programs under this subchapter." *Id.* § 1395hh(a)(1).[13]

These statutory provisions do not "expressly delegate . . . the authority to give meaning to a particular statutory term," nor do they empower an agency to "regulate subject to the limits imposed by a term or phrase . . . such as 'appropriate' or 'reasonable.'" *Loper Bright*, 603 U.S. at 394–95. They only permit an agency "'fill up the details' of a statutory scheme." *Id.* at 394. Sections 1302 and 1395hh both authorize the Secretary to do so by making rules and regulations designed to "carry out"—or for the "efficient administration" of—the statutory scheme. 42 U.S.C. §§ 1302, 1395hh.

What is an agency like CMS allowed to do when Congress authorizes it to fill up the details but does not give it power to define terms? Other CMS regulations (unrelated to EMTALA's stabilization and transfer requirements) provide a good example of how EMTALA's delegation of authority can play out in a permissible manner. EMTALA's civil

---

[13] The Secretary has delegated authority to CMS to interpret and implement "Medicare-related statutes such as EMTALA." *Torretti v. Main Line Hosps., Inc.*, 580 F.3d 168, 174 (3d Cir.), *amended*, 586 F.3d 1011 (3d Cir. 2009).

enforcement provisions require the Secretary, in considering allegations of wrongdoing under EMTALA, to request a "quality improvement organization," or QIO, to assess whether a particular patient actually "had an emergency medical condition which had not been stabilized." 42 U.S.C. § 1395dd(d)(3). The QIO must provide a report of its findings and the Secretary must provide at least 60 days for such review. *Id.*

The CMS regulation fleshes out the logistics of the statutory process, thereby filling in the gaps without contradicting the statutory language. Under the regulation, once a QIO gets a request, it must review the case and make tentative findings "before the 15th calendar day." 42 C.F.R. § 489.24(h)(2)(i). During the same period, the QIO must notify the treating physician or hospital "by certified mail, return receipt requested," with particular information about the patient at issue and an invitation to meet to discuss the case. *Id.* § 489.24(h)(2)(ii)–(iii). If such a meeting takes place, the CMS regulation governs the meeting's arrangement and who may be present. *Id.* § 489.24(h)(2)(iv).

And so on. The CMS regulations governing the QIO review process are extensive, despite the fact that such process is mentioned only in a single paragraph in the statute. Such regulations are permissible as they are "necessary to the efficient administration of the functions with which [the Secretary] is charged" under EMTALA. 42 U.S.C. § 1302(a). Those regulations do not purport to interpret or define anything in the statute, however. They only fill in gaps.

That is the type of regulation that 42 U.S.C. § 1302(a) and § 1395hh(a)(1)—both broad delegations of authority—permit CMS to promulgate. However, neither of these subsections of EMTALA permit the type of substantive, interpretive regulation at issue here.

## 2. *Specific Delegations*

EMTALA itself further authorizes the Secretary, and therefore CMS, to regulate in exactly five areas. However, none of EMTALA's specific delegations authorizes the CMS regulation the defendants rely on here. First, EMTALA permits the Secretary to define a "qualified medical person" who may sign a certification that the medical benefits of transferring a patient to another facility outweigh the increased risk. *Id.* § 1395dd(c)(1)(A)(iii) (referring to "a qualified medical person (as defined by the Secretary in regulations)"). Second, it permits the Secretary to impose additional requirements for what constitutes an "appropriate transfer," on top of the statutory baseline. *Id.* § 1395dd(c)(2)(E) (defining an appropriate transfer as that "which meets such other requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred" in addition to four other requirements). The third and fourth areas concern enforcement mechanisms not relevant here. *See id.* § 1395dd(d)(3)–(4). Fifth, EMTALA briefly mentions "regional referral centers as identified by the Secretary in regulation" as a special type of hospital subject to certain nondiscrimination requirements. *Id.* § 1395dd(g).

EMTALA does not expressly authorize the Secretary to interpret the meaning of the word "stabilized" or the phrase "to stabilize"; to the contrary, EMTALA defines those terms itself, leaving no room for agency interpretation. *Id.* § 1395dd(e)(3).

Compare the structure of EMTALA's stabilization and transfer requirements with *Loper Bright*'s examples of statutes authorizing agency discretion. First, *Loper Bright* points to statutory provisions that authorize agencies "to give meaning to a particular statutory term." 603 U.S. at 395, 396 n.5. One such statute exempts "from provisions of the Fair Labor Standards Act 'any employee employed on a casual basis in domestic

26

service employment to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves (*as such terms are defined and delimited by regulations of the Secretary*)."' *Id.* at 396 n.5 (quoting 29 U.S.C. § 213(a)(15)). Another requires "notification to [the] Nuclear Regulatory Commission when a facility or activity licensed or regulated pursuant to the Atomic Energy Act "contains a defect which could create a substantial safety hazard, *as defined by regulations which the Commission shall promulgate*." *Id.* (quoting 42 U.S.C. § 5846(a)(2). A plain reading of these statutes yields the conclusion that they authorize the relevant agencies to define certain terms. Indeed, this type of statutory provision would be rendered meaningless if, for example, the Nuclear Regulatory Commission was not allowed to follow Congress's instruction to "define[]" what "substantial safety hazard" means. 42 U.S.C. § 5846(a)(2).

EMTALA, on the other hand, does not instruct the Secretary to *define* anything related to the stabilization or transfer requirements.

Second, *Loper Bright* points to statutory provisions that authorize agencies to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" 603 U.S. at 396 & n.6. For example, one statute requires the Environmental Protection Agency to establish certain pollutant emission rules "'[w]henever, in the judgment of the [EPA] Administrator . . . , discharges of pollutants from a point source or group of point sources . . . would interfere with the attainment or maintenance of that water quality . . . which shall assure' various outcomes, such as the 'protection of public health' and 'public water supplies.'" *Id.* at 396 n.6 (first alteration and omissions in original) (quoting 33 U.S.C. § 1312(a)). Another example directs the EPA "to regulate power plants 'if the Administrator finds such regulation is

appropriate and necessary.'" *Id.* (quoting 42 U.S.C. § 7412(n)(1)(A)). In both cases, the statutes contain "words that expressly empower the agency to exercise judgment." *Moctezuma-Reyes*, 124 F.4th at 420.

EMTALA does not expressly empower the Secretary of Health and Human Services to interpret the stabilization and transfer requirements, except in one situation described below. It does not contain any words permitting the Secretary to "exercise judgment." *Id.* Nor does it authorize the Secretary "to regulate subject to the limits imposed by a term or phrase that 'leaves agencies with flexibility,' such as 'appropriate' or 'reasonable.'" *Loper Bright*, 603 U.S. at 395.

The lack of any language suggesting the Secretary could exercise judgment relating to the relevant stabilization and transfer requirements stands in stark contrast to the one place EMTALA does authorize an agency to exercise judgment. EMTALA expressly permits the Secretary to expand on the meaning of an "appropriate transfer" by imposing "*other* requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred." 42 U.S.C. § 1395dd(c)(2)(E) (emphasis added). However, that delegation comes at the end of a conjunctive list including four other baseline requirements. *Id.* § 1395dd(c)(2)(A)–(D) (defining an appropriate transfer as one "(A) in which the transferring hospital provides the medical treatment within its capacity which minimizes the risks to the individual's health . . . ; (B) in which the receiving facility (i) has available space and qualified personnel for the treatment of the individual, and (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment; (C) in which the transferring hospital sends to the receiving facility all medical records . . . ; (D) in which the transfer is effected through

28

qualified personnel and transportation equipment . . . ; and (E) which meets such other requirements *as the Secretary may find necessary*" (emphasis added)).

Therefore, while the Secretary may create "other requirements" by regulation, EMTALA does not authorize the Secretary to eliminate or interpret the statutory "appropriate transfer" requirements. Congress's explicit inclusion of this one clause delegating limited authority to the Secretary makes the absence of any other delegation concerning the stabilization and transfer requirements all the more conspicuous.

In addition, while the words "appropriate" and "reasonable" both appear in the statute, they never appear in the context of regulatory authorization. *See Moctezuma-Reyes*, 124 F.4th at 420 ("[T]he actual statutes that *Loper Bright* cited as examples of delegations that may call for deference don't only have broad language. They pair that language with words that expressly empower the agency to exercise judgment."). For example, EMTALA defines "to stabilize" as "to provide such medical treatment of the condition as may be necessary to assure, within *reasonable* medical probability, that no material deterioration of the condition is likely to result" from transfer. § 1395dd(e)(3)(A) (emphasis added). The word "reasonable" in that definition modifies the phrase "medical probability." But unlike the examples provided in *Loper Bright*, the statute does not *instruct an agency* to determine reasonableness. *See, e.g.,* 42 U.S.C. § 7412(n)(1)(A) (directing the EPA to regulate power plants "if the Administrator finds such regulation is appropriate and necessary.").

Another Medicare-related case is instructive. In *Regions Hospital v. Shalala*, 522 U.S. 448 (1998), the Supreme Court interpreted a statute providing that the "Secretary [of Health and Human Services] shall determine . . . the average amount recognized as reasonable under this subchapter for direct graduate medical education costs." *Id*. at 452

(quoting 42 U.S.C. § 1395ww(h)(2)(A)). That provision, the Court explained, could mean one of two things: "[T]he phrase 'recognized as reasonable' might mean costs the Secretary (1) *has* recognized as reasonable [before the statue was enacted] . . . , or (2) *will* recognize as reasonable as a base for future [education cost] calculations." *Id.* at 458 (emphasis added). Finding the statute was ambiguous on this question, the Court gave *Chevron* deference to the agency's interpretation of the statute (which aligned with the second option). While *Chevron* deference no longer applies, the Court's step-one analysis is telling. Even though the statute uses the word "reasonable"—and even though it instructs that the Secretary "shall determine" something related to reasonableness—it does not *unambiguously* delegate authority to the Secretary to make a reasonableness determination in the future. If the statute at issue in *Regions Hospital* did not clearly delegate such authority, surely neither does EMTALA, which does not so much as mention the Secretary in the same sentence as the stabilization definition.

EMTALA's use of the word "reasonable" as a predicate to "medical probability" indicates Congress envisioned a case-by-case factual inquiry. It was not an invitation for administrative rulemaking. Congress could have tasked the Secretary with creating regulations expounding on what "reasonable medical probability" meant. Without that clear delegation, though, courts cannot read congressional authorization for agency action into every statute that uses broad terms. *See Moctezuma-Reyes*, 124 F.4th at 420 ("If broad language alone triggered deference, we'd unwittingly return to construing less than precise words as implicit delegations to the agency that warrant deference. That can't be right. The case that declared '*Chevron* is overruled' didn't quietly reinstitute it.").

Therefore, EMTALA itself does not provide any specific delegation authorizing CMS to interpret or define the stabilization and transfer requirements. Instead, 42 U.S.C.

§ 1302(a) and § 1395hh(a)(1)—broad, chapter- and subchapter-level delegations—merely authorize CMS to "fill up the details" of the general statutory scheme. *Loper Bright*, 603 U.S. at 395.

### B. The CMS Regulation Exceeds the Scope of Delegation

The CMS regulation purports to interpret EMTALA's stabilization and transfer requirements. It modifies EMTALA's statutory requirements by providing that a hospital satisfies its stabilization obligation when it admits a patient to inpatient care. *Moses*, 561 F.3d at 583 ("The CMS rule appears contrary to EMTALA's plain language . . . ."). Therefore, the final step of the post-*Loper Bright* analysis in this case is straightforward. The CMS regulation, insofar as it limits EMTALA's stabilization requirement to patients who are not admitted as inpatients, exceeds the scope of any statutory authorization.[14]

Still, the defendants point to language in *Loper Bright* to suggest this Court should nevertheless adhere to the reasoning of earlier cases applying the CMS regulation to limit EMTALA liability after inpatient admission. While *Loper Bright* overturned *Chevron*, the Supreme Court purported to leave in place "prior cases that relied on the *Chevron* framework." *Loper Bright*, 603 U.S. at 412. "The holdings of those cases that specific agency actions are lawful . . . are still subject to statutory stare decisis despite our change in interpretive methodology." *Id*.

In this case, that language is a red herring. There is no precedent binding this Court, as a matter of "statutory stare decisis," *id*., to CMS's interpretation of EMTALA. To the contrary, I remain bound by the First Circuit's holding that EMTALA applies no

---

[14] Because I conclude the CMS regulation exceeds the scope of statutory authorization insofar as it interprets the stabilization requirement, I need not address whether the delegation otherwise exceeds Congress's constitutional authority.

matter "where within the walls [a patient] may be." *Lopez-Soto*, 175 F.3d at 173. Moreover, while this Court has applied the CMS regulation in a similar factual context, finding a patient had no cause of action under EMTALA because she was admitted as an inpatient, *see Walley*, 2018 WL 3614967, at *2, it did so while expressly declining to "engage in the conventional *Chevron* analysis of whether the statute is ambiguous and whether [the CMS regulation] is a permissible interpretation" because the plaintiff did not challenge the validity of the regulation. *Id*. at *3 (footnote omitted). Here, Mr. Duffus now makes that challenge, so I must address it under today's *Loper Bright* framework. Having done so, I conclude the CMS regulation's limitation on EMTALA liability exceeds its statutory authorization.

## II.     Stabilization Under EMTALA

The defendants maintain that, even if the Court is no longer obligated to defer to the CMS regulation, the regulation nonetheless represents the best reading of EMTALA's stabilization requirement as a matter of pure statutory interpretation. I disagree.

### 1.     The Plain Text

To determine the best reading of the statute, I "begin with the text." *Lackey v. Stinnie*, 145 S. Ct. 659, 666 (2025); *Bondi v. VanDerStok*, 145 S. Ct. 857, 875 (2025) ("[A] statute's text and context are critical . . . ."). However, I need not do so in a vacuum. Instead, I must look at the words "with a view to their place in the overall statutory scheme." *City & Cnty. of San Francisco v. Env't Prot. Agency*, 145 S. Ct. 704, 717 (2025) (characterizing that principle as a "fundamental canon" of statutory construction). Having done so, "if the plain language of the statute points unerringly in a single direction, an inquiring court ordinarily should look no further." *Lopez-Soto*, 175 F.3d at 172.

EMTALA's plain text is clear. The stabilization requirement says that a hospital must provide "for such further medical examination and such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1). "The term 'to stabilize' means . . . to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility . . . ." *Id.* § 1395dd(e)(3)(A).

Those words mean what they say: A hospital has to provide treatment as required to stabilize a patient's medical condition before transferring them. *See Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). That means the hospital has to provide treatment that reduces the risk of material deterioration of the condition when the patient is transferred. As the First Circuit has made clear, the plain language does not say that a patient's inpatient status affects the hospital's obligation. *Lopez-Soto*, 175 F.3d at 173 ("Nothing in the subsection's text suggests a necessary relationship between a hospital's obligations and the identity of the department within the hospital to which the afflicted individual presents himself."). Instead, "[t]his language *unambiguously* imposes certain duties on covered hospitals vis-à-vis *any* victim of a detected medical emergency, regardless of how that person enters the institution or where within the walls he may be when the hospital identifies the problem." *Id.* (first emphasis added).

To be sure, the stabilization requirement only arises in the context of transfer. That is, "a hospital cannot violate the duty to stabilize unless it transfers a patient." *Alvarez-Torres v. Ryder Mem'l Hosp., Inc.*, 582 F.3d 47, 51–52 (1st Cir. 2009). But if a hospital

does transfer a patient, the question for determining EMTALA liability under the stabilization requirement is whether the hospital provided medical treatment to reduce the risk of deterioration.

The transfer restriction is likewise clear. It states that "[i]f an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital may not transfer the individual" except in narrow circumstances. 42 U.S.C. § 1395dd(c)(1). Subsection (e)(3)(B) provides that the term "stabilized" means "that no material deterioration of the condition is likely, within reasonable medical probability, to result from or occur during the transfer of the individual from a facility." *Id*. § 1395dd(e)(3)(B).

Again, those words mean just what they say: A hospital cannot transfer a patient until it actually stabilizes a patient's emergency medical condition. That means the risk of material deterioration of the condition must be low—"[un]likely"—before a hospital can transfer the patient.

Tellingly, even the defendants largely agree with this reading of the statute. At oral argument, counsel for the defendants conceded that the statutory text "is difficult" for their position, and that their argument is not, ultimately, "based on statutory text."

### 2. *The Policy Behind EMTALA*

The plain meaning of the text should be the end of the matter. *Lopez-Soto*, 175 F.3d at 172. However, courts have been skeptical that Congress actually meant what it said in the stabilization and transfer provisions. *See Bryant*, 289 F.3d at 1167 ("[T]he term 'stabilize' was not intended to apply to those individuals who are admitted to a hospital for inpatient care."); *Bryan*, 95 F.3d at 352 ("[T]he stabilization requirement was intended to regulate the hospital's care of the patient only in the immediate aftermath of

the act of admitting her for emergency treatment . . . ."). As the First Circuit put it, "The principal problem is a temporal one. Requiring hospital-wide stabilization of individuals with emergency medical conditions raises the question of how long [the] stabilization obligations persist. If stabilization were mandated by EMTALA without limit of time, it might well encroach upon the province of state malpractice law." *Lopez-Soto*, 175 F.3d at 177 n.4. Accordingly, Courts have identified two rationales justifying various limitations to prevent EMTLA's asserted encroachment on state malpractice law.

The first rationale for reading temporal limitations into EMTALA is textual. EMTALA states that "[t]he provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section." 42 U.S.C. § 1395dd(f). The Fourth Circuit relied on this provision in support of its conclusion that EMTALA must have some temporal limitation. *Bryan*, 95 F.3d at 352 ("EMTALA is quite clear that it is not intended to preempt state tort law except where absolutely necessary.").

This rationale is unconvincing, however. The fact that EMTALA does not preempt state law does not mean EMTALA cannot *coexist* with state law. After all, just as there "is nothing unusual about a state supplementing a federal statute with stronger regulations," *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 325 (1st Cir. 2012), not "every federal statute ousts all related state law." *Hillsborough Cnty. v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985). Federal and state laws often coexist in the same field without tension. Preemption only occurs when the federal regulatory scheme is "sufficiently comprehensive to make reasonable the inference that Congress 'left no room' for supplementary state regulation" or where "the field is one in which 'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws

on the same subject.'" *Id.* at 713 (citations omitted); *see also Moyle v. United States*, 603 U.S. 324, 332 (2024) (Barrett, J., concurring) (discussing preemption in EMTALA context). I see no such dominance in this context.

Indeed, EMTALA's anti-preemption provision could just as well support the conclusion that EMTALA applies to inpatients, with no temporal limit. The anti-preemption provision could suggest Congress thought EMTALA's obligations *would* regulate in the same field as state law, so it sought to ensure state law's continuing validity—despite EMTALA's overlap—by expressly disclaiming federal preemption. Indeed, if Congress did not expect EMTALA to overlap with state malpractice law, the anti-preemption provision would be unnecessary.

The second rationale for reading temporal limitations into EMTALA is grounded in congressional intent. Most courts have concluded that "Congress's sole purpose in enacting EMTALA was to deal with the problem of patients being turned away from emergency rooms for non-medical reasons." *Bryan*, 95 F.3d at 351; *Harry v. Marchant*, 291 F.3d 767, 773 (11th Cir. 2002) ("The legislative history of EMTALA makes clear the statute was not intended to be a federal malpractice statute, but instead was meant to supplement state law *solely with regard to the provision of limited medical services to patients in emergency situations.*" (emphasis added)).

This rationale is more compelling than the first, but at most it suggests that Congress intended *some* temporal limitation. The statute does not provide what that limitation would be, nor does it authorize the Secretary to decide. Moreover, the CMS regulation's bright-line rule also appears inconsistent with congressional intent. As the First Circuit explained in *Lopez-Soto*, "Congress obviously had a horizon broader than the emergency room in mind when it enacted EMTALA." 175 F.3d at 176. Moreover,

EMTALA's primary purpose—preventing patient dumping—"is served, not undermined, by forbidding the dumping of any hospital patient with a known, unstabilized, emergency condition." *Id.* at 177. Dumping an unstabilized inpatient "is equally as pernicious as what occurs in emergency departments," so the First Circuit was "unprepared to say that Congress did not seek to curb it." *Id.*

In other words, the case law presents two conflicting stories of congressional intent: one in which Congress sought to avoid creating a general federal malpractice law, and another in which Congress sought to prevent patient dumping no matter where it occurs. The impossibility of deciding which aspect of congressional intent to elevate and which to ignore demonstrates precisely why courts may "not resort to legislative history to cloud a statutory text that is clear." *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994). Simply put, it is not the court's role to balance congressional policy interests against each other, or against the plain text. *Cunningham v. Cornell Univ.*, 145 S. Ct. 1020, 1031 (2025). Therefore, "[e]ven if [I] thought sound policy called for" more temporally limited stabilization and transfer requirements than provided by the statute, "that policy choice is a 'matte[r] for Congress, not this Court, to resolve.'" *Soto v. United States*, 145 S. Ct. 1677, 1689 (2025) (citations omitted) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)).

As a last resort, the defendants draw on the canon of legislative ratification. Under that canon, "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978). Because the CMS regulation went into effect in 2003, and Congress has amended EMTALA during the intervening twenty-two years, *see, e.g.*, Medicare Prescription Drug, Improvement, and

Modernization Act of 2003, Pub. L. 108-173, 117 Stat. 2066; Act of Oct. 21, 2011, Pub. L. 112-40, 125 Stat. 401, the defendants suggest Congress intended to ratify the CMS regulation's interpretation of EMTALA.

To begin, it is not clear whether the legislative ratification canon applies to administrative interpretations after *Loper Bright*. I need not decide that question, however, because the canon does not apply for other another reason. For "the legislative ratification canon to apply, two requirements must be met: (1) Congress must reenact the statute without change; and (2) '[t]he supposed judicial consensus [must be] so broad and unquestioned that we must presume Congress knew of and endorsed it.'" *Bernardo ex rel. M & K Eng'g, Inc. v. Johnson*, 814 F.3d 481, 488 (1st Cir. 2016) (quoting *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 349 (2005)).

Here, neither the judicial nor the administrative consensus is "broad" or "unquestioned." *Id*. While some courts of appeals have interpreted EMTALA in a manner consistent with the CMS regulation, the Sixth Circuit expressly found the regulation incompatible with EMTALA's plain text and declined to apply it. *See Thornton*, 895 F.2d at 1135; *see also Lopez-Soto*, 175 F.3d at 173. I cannot infer Congress intended to ratify a consensus that never existed in the first place.

*       *       *

EMTALA's text is clear. The stabilization requirement means that a hospital must provide treatment as required to stabilize a patient's medical condition before transfer. The transfer restriction means that a hospital may not transfer a patient until it actually stabilizes a patient's emergency medical condition. A hospital's decision to admit the patient has no effect on EMTALA's statutory requirements.

To be sure, many patients admitted to inpatient care may be considered stabilized under EMTALA, as Mr. Duffus recognizes. *See* ECF No. 11 at 16 n.7 ("[A] good-faith admission will in many, if not most, cases be a strong indication that EMTALA was fully complied with; however, it does not follow that that will always and necessarily be the case."). But EMTALA's text does not support a bright-line rule that ties a hospital's EMTALA obligations to a patient's status—inpatient or outpatient—on paper alone. Instead, EMTALA concerns itself with the "medical treatment" a hospital provides before transfer, and the "reasonable medical probability" that a patient's emergency medical condition will deteriorate during transfer. 42 U.S.C. § 1395dd(e)(3).

### III.    Mr. Duffus's Claims

Turning to the facts of this case, I apply a two-step inquiry to resolve the defendants' motion to dismiss: First, "isolate and ignore statements in the complaint that simply offer legal labels and conclusions." *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012). Second, "take the complaint's well-pled (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Id*.

In light of EMTALA's plain meaning, the result is straightforward. Mr. Duffus alleges that Pen Bay Medical Center transferred him by Life Flight to MMC after Pen Bay realized it did not have the facilities to treat him. Therefore, Mr. Duffus "came to" MMC within the meaning of EMTALA. 42 U.S.C. § 1395dd(b)(1); *see Lopez-Soto*, 175 F.3d at 173 (holding § 1395dd(b) applies "regardless of how [a] person enters the institution").

Mr. Duffus alleges he suffered a hemorrhagic stroke. Pen Bay diagnosed Mr. Duffus with hypertension and intracerebral hemorrhage, and contacted MMC to request treatment for him, which MMC accepted. Mr. Duffus alleges the existence of MMC

records that reflect the severity of Mr. Duffus's condition. *See* ECF No. 1 at 3, ¶ 20 ("MMC's[] records indicate that the Plaintiff had suffered an intracerebral hemorrhage . . . ."). While the Complaint only notes one specific record dated the day Mr. Duffus arrived at MMC, July 17, 2022, I can reasonably infer that, in accepting Mr. Duffus and beginning to treat him, MMC "determined" he suffered the emergency medical condition—an intracerebral hemorrhage—that Pen Bay diagnosed him with and contacted MMC about.[15] *See* 42 U.S.C. § 1395dd(b)(1).

Mr. Duffus alleges MMC failed to stabilize his emergency medical condition before discharging him. On July 28, 2022, the day before Mr. Duffus was discharged, a therapist noted that Mr. Duffus "would benefit from increased time here prior to taking a flight back to Jamaica to improve strength and balance." ECF No. 1 at 4, ¶ 23. While some medical records contain statements suggesting Mr. Duffus was ready to travel by plane when he was discharged, other medical records contradict that conclusion. *Id*. at 5, ¶ 25. Moreover, at the time of his discharge, Mr. Duffus could not "travel without substantial assistance, was still suffering from significant difficulty in speaking, [was] unable to perform physical motions needed to move himself," and was unable to "use an airline toilet or even feed himself." *Id*. At this stage, taking all the facts in the light most favorable to Mr. Duffus, I must infer that MMC failed to stabilize him.[16] *Schatz*, 669 F.3d at 55.

---

[15] Mr. Duffus also alleges that "MMC determined that [he] had a condition which was manifesting itself by acute symptoms of sufficient severity such that . . . in the absence of immediate medical attention" his health would be placed in "serious jeopardy." ECF No. 1 at 3. This conclusory allegation simply restates the statutory definition of "emergency medical condition." 42 U.S.C. § 1395dd(e)(1). Nonetheless, Mr. Duffus alleges adequate facts to support a reasonable inference that MMC determined he suffered a medical condition meeting this definition.

[16] The defendants do not argue that Mr. Duffus's consent to discharge—whether "constructively coerced," ECF No. 1 at 8, ¶ 40, or otherwise—bars his claims.

At oral argument, the defendants suggested that Mr. Duffus's allegation that his condition worsened after discharge was conclusory. However, the question is not whether "material deterioration" of a patient's condition actually occurs. 42 U.S.C. § 1395dd(e)(3)(B). The question under EMTALA is whether "material deterioration of the condition [was] *likely*, within *reasonable medical probability*, to result from or occur during" his transfer. *Id.* (emphasis added). Mr. Duffus alleges sufficient facts to infer that material deterioration of his condition was likely upon transfer, whether or not such deterioration ultimately occurred.

## CONCLUSION

EMTALA's plain text does not support a bright-line rule absolving a hospital of liability under the stabilization and transfer requirements once the hospital admits a patient to inpatient care. Because Mr. Duffus plausibly alleges MMC failed to comply with EMTALA's textual stabilization and transfer requirements, the defendants' motion to dismiss is **DENIED**.

So Ordered.

Dated this 14th day of July, 2025.

/s/ Stacey D. Neumann
UNITED STATES DISTRICT JUDGE