**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **EDWIN GEORGE DUFFUS,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 2:24-cv-00268-SDN** |
| | ) | |
| **MAINEHEALTH dba MAINE MEDICAL CENTER,** | ) | |
| | ) | |
| **Defendant** | ) | |
| | ) | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**
**AND DEMAND FOR JURY TRIAL**

## I. INTRODUCTION

1. In July 2022, Defendant MaineHealth and Maine Medical Center (together, "Defendant") agreed to admit and treat Plaintiff Edwin George Duffus ("Mr. Duffus") for an emergency medical condition. But, before Mr. Duffus' emergency medical condition was stabilized and without plans for an appropriate transfer to continued care, Defendant discharged him on a plane back to Jamaica. In doing so, Defendant violated the Emergency Medical Treatment and Active Labor Act (EMTALA), 42 U.S.C. § 1395dd, which prohibits the practice of "patient-dumping" by hospitals which receive Medicare payments from the federal government. And because Defendant also denied him his contractual rights and the benefits of its health program or activity because he was Black and Jamaican, it also discriminated against him on the basis of race, color, ancestry, and national origin, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and the Patient Protection and Affordable Care Act (ACA), 42 U.S.C.

§ 18116(a). As a result of Defendant's actions, Mr. Duffus suffered serious personal harm and losses, for which he now seeks relief.

## II. JURISDICTION AND VENUE

2. This Court has original jurisdiction over Mr. Duffus' claims arising under federal law pursuant to 28 U.S.C. § 1331.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to Mr. Duffus' claim occurred in this District.

## III. DEMAND FOR JURY TRIAL

4. Mr. Duffus demands a jury trial on all issues triable of right by a jury.

## IV. PARTIES

5. Mr. Duffus is a 67-year-old citizen of Jamaica who was admitted to the United States on June 3, 2022, with a temporary work visa issued pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(a) — commonly known as an H-2A visa — and employed as a farm worker in Warren, Maine.

6. Mr. Duffus is Black, of African Caribbean and Jamaican ancestry, and of Jamaican national origin.

7. Mr. Duffus currently resides in Jamaica.

8. Mr. Duffus is married and has four children, who in July 2022 were aged 13, 16, 20, and 24. Until July 2022, Mr. Duffus was the primary wage earner for his family, working as a farmer in Jamaica and as a seasonal farmworker in the United States.

9. Defendant MaineHealth is a Maine non-profit corporation with a principal place of business in Portland, Maine.

10. Maine Medical Center (MMC) is a non-profit tertiary-care hospital with a principal place of business in Portland, Maine.

11. MaineHealth is an integrated healthcare system which includes MMC. MMC is part of and a trade name of MaineHealth's integrated healthcare system. MaineHealth and MMC are hereinafter jointly referred to as "Defendant," or "MMC" when referring to that individual facility.

12. At all times relevant to this case, Defendant operated an emergency department at MMC.

13. At all times relevant to this case, Defendant participated in the federal Medicare Program, had entered into Medicare Agreements requiring compliance with Centers for Medicare and Medicaid Services (CMS) Conditions of Participation.

14. At all times relevant to this case, Defendant received Medicare payments from the federal government.

15. Defendant had entered into an agreement with the Secretary of the U.S. Department of Health and Human Services pursuant to 42 U.S.C. § 1395cc, which at all times relevant to this case was in full force and effect.

## V. <u>FACTS</u>

### A. MMC admitted Mr. Duffus to treat his emergency medical condition.

16. On July 17, 2022, at approximately 7:30 a.m., Mr. Duffus suffered a hemorrhagic stroke in Warren, Maine.

17. Mr. Duffus was taken to Pen Bay Medical Center ("Pen Bay") in Rockport, Maine, for emergency treatment. At Pen Bay, he was diagnosed with hypertension and an intracerebral hemorrhage.

18. Given the seriousness of his condition and because Pen Bay did not have facilities adequate to treat Mr. Duffus, an emergency physician at Pen Bay contacted MMC and requested treatment on Mr. Duffus' behalf.

19. MMC agreed to accept Mr. Duffus as a patient.

20. Mr. Duffus was transported by a LifeFlight of Maine helicopter to MMC and arrived at approximately 11:19 am on July 17, 2022.

21. MMC initially admitted Mr. Duffus to its Neurocritical Care Unit.

22. By admitting Mr. Duffus, Defendant entered into a contract with him.

23. Defendant offered Mr. Duffus medical treatment in accordance with applicable policies and requirements; Mr. Duffus accepted the offer of medical treatment and agreed to responsibility for payment to Defendant. The contract was supported by valid and sufficient consideration from both parties, including but not limited to Defendant's claim that Mr. Duffus incurred in excess of $159,000 in debt for his treatment by Defendant.

24. Defendant's records indicate that Mr. Duffus had suffered an intracerebral hemorrhage, sometimes referred to as an "ICH," caused by severe hypertension, or high blood pressure. For example, on the day Mr. Duffus was admitted to MMC, July 17, 2022, Defendant's staff recorded that he had an "[i]ntracerebral hematoma in the left basal ganglia region" and that he had "severe HTN," or hypertension.

25. Defendant also diagnosed Mr. Duffus with several conditions that resulted from his ICH, including right side hemiparesis, or muscle weakness leading to paralysis; expressive

aphasia, or a reduced ability to verbally communicate; hypomimia, or reduced facial expression; hypophonia, or a reduction in voice volume and clarity; dysarthria, a speech disorder caused by muscle weakness resulting in slurred or slow speech; decreased balance; and decreased activity tolerance.

26. A Pulmonary/Critical Care Medicine progress note dated July 22, 2022, states that "[t]his patient is critically ill with ICH, severe hypertension, and at risk for neurologic, circulatory decompensation."

27. Together, the intracerebral hemorrhage, hypertension, hemiparesis and their consequent conditions were conditions that were manifesting themselves by acute symptoms of sufficient severity such that that in the absence of immediate medical attention, they could reasonably be expected to place Mr. Duffus' health in serious jeopardy, result in serious impairment to his bodily functions, and/or result in serious dysfunction of a bodily organ or part. 42 U.S.C.§ 1395dd(e)(1)(A).

28. Defendant therefore determined that Mr. Duffus had an emergency medical condition under the meaning of EMTALA. *Id.*

29. Mr. Duffus was an inpatient at MMC from July 17, 2022, until his discharge at approximately 2:00 a.m. on July 29, 2022.

**B. Defendant did not make an appropriate plan for Mr. Duffus' discharge and discharged him before his emergency medical condition was stabilized.**

30. MMC's records reveal that, at the time of admission to MMC on July 17, 2022, Mr. Duffus' blood pressure fluctuated between readings of 135/67 to 198/100.

31. Upon his admission, Defendant's staff began attempting to control Mr. Duffus' blood pressure and hypertension with medication.

32. During the course of his hospitalization, Mr. Duffus' blood pressure continued to fluctuate, reaching readings as high as 174/101 on July 23, 2022, and 172/72 on July 26, 2022.

33. On July 28, 2022, less than a day before his discharge, Mr. Duffus' blood pressure was 157/90.

34. MMC's records reveal that Mr. Duffus' pulse rate also fluctuated during the final days of his hospital stay.

35. On July 26, 2022 — three days before his discharge — Mr. Duffus' pulse was recorded at 49. Defendant's attending physician recorded the reading in Mr. Duffus' chart with an exclamation point next to it and a note that a nurse had been notified.

36. Defendant provided Mr. Duffus with physical, occupational, and speech-language therapy during his stay at MMC in order to treat his hemiparesis, aphasia, hypomimia, hypophonia, dysarthria, decreased balance, and decreased activity tolerance.

37. Per Defendant's records, an occupational therapy Daily Activity Standardized T-Scale score of over 39.4 indicates that a patient is more likely to be able to return home, but an occupational therapy T-Scale score under 39.4 indicates that a patient is more likely to need to go to rehabilitation.

38. At his first occupational therapy encounter on July 18, 2022, Mr. Duffus' Daily Activity Standardized T-Scale score was 27.31. At his last occupational therapy encounter on July 28, 2022, Mr. Duffus' T-Scale score was 32.03, suggesting he required further occupational therapy and rehabilitation.

39. Per Defendant's records, physical therapy Daily Activity Standardized T-Scale score of over 42.9 indicates that a patient is more likely to be able to return home, but a T-Scale score under 42.9 indicates that a patient is more likely to need to go to rehabilitation.

40. At his first physical therapy encounter on July 18, 2022, Mr. Duffus' Mobility Standardized T-Scale score was 19.39. At his last physical therapy encounter on July 28, 2022, Mr. Duffus' T-Scale score was 32.33, suggesting he required further physical therapy and rehabilitation.

41. Throughout his hospitalization, MMC physical and occupational therapists consistently recommended that Mr. Duffus receive, and be discharged to, acute rehabilitation, i.e., an inpatient rehabilitation facility.

42. On July 18, 2022, Defendant's physical therapist Sara Hanken noted that Mr. Duffus' [c]linical presentation [wa]s unstable with unpredictable characteristics," and that he would "benefit from PT to maximize functional level. Recommend inpatient rehab."

43. On July 22, 2022, Defendant's physical therapist Erica Egeler noted that Mr. Duffus "continues to require aggressive rehab efforts given his profound right sided weakness" and "will be an excellent acute rehab candidate."

44. On July 26, 2022, Defendant's physical therapist Alison Glass noted that she "[c]ontinue[d] to recommend ongoing physical therapy and rehab when medically stable" and that she "[q]uestion[ed] if [Mr. Duffus] c[ould] safely fly back to Jamaica with a one person assist by end of this week."

45. On July 28, 2022, Defendant's physical therapist Lauren Baecher noted that Mr. Duffus "would benefit from increased time here prior to taking a flight back to Jamaica to improve strength and balance" and that "[u]pon return to Jamaica [Plaintiff] remains appropriate [candidate for] rehab."

46. Defendant's other staff were aware of the recommendations of his care team.

47. On July 18, 2022, Defendant's social worker Margaret Estabrooks noted that the "[l]ong term plan [is] to return to Jamaica. Obviously, transport logistics will depend on pt's rehab gains."

48. On July 19, 2022, Defendant's care manager Lisa Irving noted that Mr. Duffus' discharge plan was "[a]cute rehab pending payor source."

49. On July 22, 2022, Defendant's care manager Kristin Jordan noted that Mr. Duffus' care time recommended acute rehabilitation, noting, "OT & PT recs = rehab."

50. Despite Defendant's staff's consistent clinical findings indicating that Mr. Duffus should receive acute rehabilitation, Defendant's staff decided to repatriate Mr. Duffus by plane to Jamaica without making an appropriate plan for his continued care and specifically, without providing him with a transfer to acute rehabilitation.

51. Defendant's staff did not make arrangements with any acute rehabilitation center in Jamaica for Mr. Duffus' treatment after his discharge.

52. Defendant's staff did not request or instruct Mr. Duffus' wife or other family members to arrange treatment at an acute rehabilitation center in Jamaica prior to his discharge.

53. The only effort Defendant made to ensure Mr. Duffus received acute rehabilitation after discharge was to include in his discharge packet a blank sign-up form for Revamp Acute Rehab, a treatment center in Kingston, Jamaica — approximately two hours by taxi from Mr. Duffus' residence.

54. Defendant's staff did not make contact with any primary care doctor in Jamaica before or after discharging Mr. Duffus.

55. Defendant's staff did not provide adequate instruction to Mr. Duffus' wife on his medication regimen on discharge and only provided said instructions in a packet of information handed to her in Jamaica.

56. As of that date and time of his discharge, Mr. Duffus was unable to travel without substantial assistance, was still suffering from significant difficulty in speaking, and was unable to perform the physical motions needed to move himself, use an airline toilet, feed himself, or take his own medications.

57. Mr. Duffus' physical limitations put him at elevated risk for a fall, which would have been likely to result in material deterioration to his emergency medical condition by causing another intracerebral hemorrhage, as well as by causing secondary conditions, such as pressure ulcers.

58. Mr. Duffus' physical limitations put him at elevated risk for improper administration of his discharge medications, which would have been likely to result in material deterioration to his emergency medical condition by increasing his hypertension to emergency levels, causing unhealthy fluctuation in his blood pressure levels, and causing cardiac abnormalities.

59. Together, these aspects of Mr. Duffus' condition upon discharge made it likely that Mr. Duffus' emergency condition would materially deteriorate after discharge.

**C. Defendant denied Mr. Duffus the benefits of Defendant's health program or activity and denied him equal access to enjoyment of all benefits, privileges, terms, and conditions of his contractual relationship with Defendant.**

60. As alleged above, Defendant entered into a contract with Mr. Duffus when they admitted him for treatment on July 17, 2022.

61. Defendant's contract with Mr. Duffus incorporated Defendant's own policies and procedures as well as the requirements of federal law.

62. Defendant also presented Mr. Duffus with a written "Consent to Treatment," containing additional terms, which Mr. Duffus signed on July 19, 2022.

63. The Consent to Treatment explicitly provided that Mr. Duffus had the right to informed consent.

64. The Consent to Treatment explicitly provided that Mr. Duffus had the right to participate in decisions regarding his treatment and in planning and making decisions about his discharge.

65. Defendant's own policies, as set out in a document titled "The Patient Care Partnership: Understanding Expectations, Rights, and Responsibilities," require that patients have the right to "be treated with respect," "be informed about [their] care" and "make decisions about [their] care."

66. Federal regulations condition the receipt of federal Medicare funds on hospitals complying with Conditions of Participation that provide patients with certain rights, including that "[t]he patient has the right to participate in the development of his or her plan of care." 42 C.F.R. § 482.13(b)(2). The regulations further state that "[t]he patient or his or her representative . . . has the right to make informed decisions regarding his or her care. The patient's rights include being informed of his or her health status, being involved in care planning and treatment, and being able to request or refuse treatment." *Id.* § 482.13(b)(2).

67. Mr. Duffus therefore had rights under his contracts with Defendant to informed consent, to participate in decisions regarding his treatment and discharge, and to participate in the development of his plan of care.

68. Mr. Duffus' rights to informed consent, to participate in decisions regarding his treatment and discharge, and to participate in the development of his plan of care, also constituted benefits of Defendant's health program or activity.

69. Mr. Duffus also had rights under Defendant's own policies, as incorporated by his contracts with Defendant, to be treated with respect.

70. The right to be treated with respect pursuant to Defendant's own policies was also a benefit of Defendant's health program and activity.

71. Federal regulations and the Conditions of Participation also require that hospitals receiving federal Medicare funds ensure an effective discharge planning process for each patient, which "must include an evaluation of a patient's likely need for appropriate post-hospital services . . . and must also include a determination of the availability of the appropriate services as well as of the patient's access to those services." *Id.* § 482.43(a)(2).

72. Mr. Duffus therefore had the right under his contracts with Defendant to an effective discharge planning process.

73. Mr. Duffus' right to an effective discharge planning process was also a benefit of Defendant's health program or activity.

74. Federal regulations also require that hospitals receiving federal Medicare funds maintain confidentiality of a patient's medical records. *Id.*§ 482.13(d)(1).

75. Other federal regulations also require that Defendant not disclose Mr. Duffus' protected health information except in certain limited circumstances. 45 C.F.R. §§ 164.502(a), 164.508(a)(1), 482.13 (d)(1).

76. The Consent to Treatment also provided that Mr. Duffus had the right to have his medical information kept confidential by Defendant.

77. Mr. Duffus therefore had the right under his contracts with Defendant to the confidentiality of his protected health information.

78. Mr. Duffus' right to the confidentiality of his protected health information also was a benefit of Defendant's health program or activity.

79. Mr. Duffus also had the right under his contracts with Defendant to a provider of his own choosing.

80. The right to have a provider of his own choosing was a benefit of Defendant's health program or activity.

81. Mr. Duffus also had the right to enter into a contract for health insurance.

82. An additional benefit of Defendant's health program or activity was the right to apply for an Affordable Care Act health insurance plan, subject to eligibility criteria.

83. Defendant denied Mr. Duffus each of the above rights under contract and benefits of Defendant's health program or activity.

84. Defendant denied Mr. Duffus the right to participate in the development of his own plan of care and/or make his own plan of care and/or be involved in care planning and treatment and/or make himself or make by proxy informed decisions about his own plan of care, thereby denying him the benefits of their health program or activity and denying him his contractual rights. .

85. As of July 19, 2022, Defendant's staff had recorded that they had difficulty communicating with Mr. Duffus and that, while he spoke English, he needed an interpreter. However, Defendant failed to provide any interpreter for Mr. Duffus throughout his hospital stay.

86. Due to his expressive aphasia, as diagnosed by Defendant's staff, Mr. Duffus could not effectively verbally communicate his desires for his care.

87. Defendant did not afford Mr. Duffus the opportunity to appoint a proxy for communication.

88. Defendant also repeatedly ignored the wishes of Mr. Duffus' close family members, including his wife and brother, that Mr. Duffus remain in the United States for acute rehabilitation.

89. On or about July 26 and July 27, 2022, Mr. Duffus' wife, Valda Duffus ("Ms. Duffus") spoke with Defendant's nurse and later with Defendant's Dr. Innocent Ndzana ("Dr. Ndzana"). Ms. Duffus verbally told both that Mr. Duffus was too sick to be sent home to Jamaica, and that he should stay in Maine to get more treatment and therapy before returning home.

90. Dr. Ndzana made no note in the medical record of his conversation with Ms. Duffus nor of her request that Mr. Duffus receive further treatment in the United States.

91. Dr. Ndzana did not heed Ms. Duffus' expressed wishes for Mr. Duffus' treatment and plan of care.

92. On July 28, 2022, Dr. Ndzana recorded in Mr. Duffus' medical records that Mr. Duffus and Mr. Duffus' brother had told him on July 27 that "they would prefer that patient not return to Jamaican and pursue aggressive physical therapy in the US."

93. Dr. Ndzana ignored Mr. Duffus' and his brother's expressed wishes for Mr. Duffus' treatment and plan of care, instead recording in the same medical record note that the disposition of Mr. Duffus' case was "[a]nticipated discharge to Jamaica."

94. In his discharge summary of July 29, 2022, Dr. Ndzana wrote that the disposition of Mr. Duffus' course of treatment was "[r]epatriation to Jamaica" even though the disposition of

"repatriation" did not meet the requirements for an appropriate discharge under Defendant's policies or regulatory obligations.

95. The Jamaica Central Labour Organisation (JCLO) is an agency of the Jamaican government headquartered in Washington, D.C. JCLO is charged with facilitating the employment of H-2A workers in the United States and monitoring their welfare while in the United States.

96. Throughout Mr. Duffus' hospitalization, Defendant's staff communicated with a representative of JCLO, Nora Smikle-Dryden, about Mr. Duffus' options for health insurance coverage and discharge.

97. For example, on July 21, 2022, Defendant's social worker Margaret Estabrooks enlisted the help of Smikle-Dryden in obtaining Mr. Duffus' paystubs for the purpose of determining his options for health care coverage.

98. Also on July 21, 2022, Estabrooks noted in Mr. Duffus' medical file that JCLO would "be able to pay for the transport home to Jamaica."

99. On July 25, 2022, Defendant's social worker Briana Costello noted in Mr. Duffus' medical file that Smikle-Dryden would be accompanying Mr. Duffus on a flight home to Jamaica.

100. Defendant's staff therefore treated JCLO as Mr. Duffus' *de facto* proxy decisionmaker without his consent.

101. Defendant also denied Mr. Duffus his right to the confidentiality of his protected health information, thereby denying him the benefits of their health program or activity and denying him his rights under contract.

102. On July 25, 2022, and again on July 26, 2022, Defendant's social worker Briana L. Costello, LICSW, faxed voluminous medical records of Mr. Duffus' protected health information to JCLO employee Nora Smikle-Dryden.

103. These disclosures of Mr. Duffus' protected health information did not fall into any category of permitted or required disclosure under federal regulation, nor was it known to or authorized by Mr. Duffus.

104. On July 28, 2022, ten days after the unauthorized disclosure of his protected health information to JCLO, Defendant's staff belatedly obtained Mr. Duffus' signature on a form authorizing release of his medical information to JCLO.

105. Defendant also denied Mr. Duffus his right to an effective discharge planning process, thereby denying him the benefits of their health program or activity and denying him his rights under contract.

106. Defendant did not conduct an evaluation of Mr. Duffus' likely need for appropriate post-hospital services in Jamaica in accordance with their obligations under federal regulation.

107. Defendant did not determine the availability of appropriate post-hospital services in Jamaica in accordance with their obligations under federal regulation.

108. Defendant did not determine Mr. Duffus' ability to access appropriate post-hospital services in Jamaica in accordance with their obligations under federal regulation.

109. Defendant also denied Mr. Duffus his right to apply for an ACA health insurance plan for which he was eligible, thereby denying him his rights under his contracts with Defendant and the benefits of Defendant's health program or activity.

110. At the time of his admission to MMC, and for the entire time of his inpatient stay at MMC, Mr. Duffus was eligible to apply for health insurance under the ACA.

111. Mr. Duffus did not know that he was eligible for ACA coverage, and the Defendant did not inform him that he was eligible for ACA coverage. Nor did the Defendant offer to assist Mr. Duffus in obtaining health insurance under the ACA.

112. Defendants also denied Mr. Duffus his right to choose a provider of his own care, thereby denying him the benefits of their health program or activity and denying him his rights under contract.

113. Mr. Duffus had primary care available to him in July 2022 from Dr. Demetri Blanas, Medical Director of the Maine Mobile Health Program (MMHP), a federally qualified health center which provides health care services primarily to migrant farm workers in Maine.

114. On July 28 and July 29, 2022, Dr. Blanas attempted several times to reach Defendant's staff to discuss the medical appropriateness of Mr. Duffus' discharge and to offer MMHP's assistance in seeking sources of financial support for Mr. Duffus, including insurance coverage under the ACA.

115. In Dr. Blanas's calls attempting to reach Mr. Duffus' doctors, Defendant's staff laughed at Dr. Blanas and/or hung up on him.

116. Defendant's doctor did not ever call Dr. Blanas back but instead simply left a note in Mr. Duffus' discharge summary to fax Mr. Duffus' records to MMHP — despite knowing that Mr. Duffus was being discharged directly to Jamaica.

117. Defendant also denied Mr. Duffus his right to be treated with respect, thereby denying him the benefits of their health program or activity and denying him his rights under contract.

118. Defendant denied Mr. Duffus his right to be treated with respect by failing to involve him or his family members in developing his plan of care or respect his family's wishes for his continued care.

119. Defendant denied Mr. Duffus his right to be treated with respect by failing to make appropriate plans for his care during his flight back to Jamaica, such that when Mr. Duffus landed in Jamaica, he had not eaten since the night before, and he had not received assistance using the bathroom or changing his diaper.

120. Defendant denied Mr. Duffus his right to be treated with respect by failing to communicate with his family about the timeline for his discharge or when he would be landing in Jamaica.

121. Defendant denied Mr. Duffus his right to be treated with respect by ignoring Ms. Duffus' requests for a meeting with Defendant doctors prior to Mr. Duffus' discharge.

122. Defendant denied Mr. Duffus his right to be treated with respect by denying JCLO representatives' request that Defendant provide Mr. Duffus with an ambulance to transport him from MMC to the airport upon discharge.

123. As a result of the above, Defendant prevented Mr. Duffus from having equal "enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" with Defendant. 28 U.S.C. § 1981(b).

124. As a result of the above, Defendant "denied [Mr. Duffus] the benefits of . . . [their] health program or activity." 42 U.S.C. § 18116.

125. Defendant denied Mr. Duffus equal rights to contractual benefits and the benefits of Defendant's health program or activity because of Mr. Duffus' race, ancestry, and national origin.

126. As of July 19, 2022, Defendant's staff had recorded in their notes that Mr. Duffus was "Black or African." Defendant's staff also variously identified Mr. Duffus as "from Jamaica" and "in Maine as a laborer," "migrant laborer," "or migrant worker," and that he "normally resides in Jamaica."

127. On the day of Mr. Duffus' admission, July 17, 2022, Defendant's social worker Brianna Costello recorded her preconception about his eligibility for insurance or other coverage based on his status, writing, "[u]nclear eligibility [for coverage] given patient is from Jamaica and in the US working."

128. On July 25, 2022, Defendant's doctor Michael Hellen described Mr. Duffus as a "[m]igrant worker from Jamaica," and wrote that Mr. Duffus was "medically ready to travel in an air plane" even though at that time no one had determined Mr. Duffus was medically stabilized.

129. Defendant's staff decided upon and enacted their scheme to repatriate Mr. Duffus based on bias against him because of his race, color, ancestry and national origin, and used forced repatriation as an illegal means to bypass Defendant's obligations to provide Mr. Duffus with an appropriate discharge.

130. Defendant's numerous violations of Mr. Duffus' rights and benefits under his contracts with Defendant, Defendant's own policies, and federal law and benefits of Defendant's health program or activity were motivated by bias against Mr. Duffus on the basis of his race, color, ancestry, and national origin.

131. The callousness with which Defendant treated Mr. Duffus during his discharge and failure to make plans for his safe discharge and transport was motivated by bias against Mr. Duffus because of his race, ancestry, and national origin.

132. Defendant's staff at times indicated that Mr. Duffus needed to be discharged because he lacked health insurance and could not obtain health insurance, but any such justification was pretextual.

133. Specifically, Defendant's social worker Margaret Estabrooks and care manager Kristin Jordan each separately explained in Mr. Duffus' medical files that Mr. Duffus did not qualify for MaineCare, Maine's Medicaid program, because he was "over income."

134. Similarly, Defendant's social worker Briana L. Costello noted in Mr. Duffus' medical file that Mr. Duffus did not have enough weeks of paystubs from his H-2A seasonal job in Maine to apply for Free Care, Defendant's financial assistance program.

135. However, Defendant's staff left other, contradictory notes in Mr. Duffus' medical file, which indicated that the reason why Mr. Duffus could not apply for or be eligible for health insurance plans was because Defendant had already decided to discharge him to Jamaica.

136. Specifically, Defendant's Case Manager Julie Orrego stated that Free Care was not a good option because the "patient will be discharging soon," and it may take a month or longer for a response on Free Care coverage. She then closed Mr. Duffus' case for insurance coverage. Orrego also told JCLO employee Nora Smikle-Dryden that Mr. Duffus was ineligible for MaineCare because he would be returning to Jamaica upon discharge.

137. Moreover, Defendant's staff repeatedly refused MMHP's and Dr. Blanas's assistance, who knew about the availability of an insurance plan through the ACA and could have assisted Defendant in helping Mr. Duffus apply for such insurance.

138. Defendant's staff at times indicated that Mr. Duffus needed to be discharged because of MMC's space constraints, but any such justification was pretextual.

139. Defendant's physician told Mr. Duffus' wife, Valda Duffus, in a phone call that Mr. Duffus needed to return to Jamaica because MMC "needed the bed."

140. Defendant's staff attempted to inform Mr. Duffus that he would soon be discharged back to Jamaica.

141. At the time, Mr. Duffus did not understand the plan for his discharge, including whether he would be discharged back to the blueberry farm in Warren, Maine, or to Jamaica.

142. Nor could Mr. Duffus effectively communicate his questions about or his wishes for his discharge due to his expressive aphasia.

143. At approximately 2:00 a.m. on July 29, 2022, Defendant supplied Mr. Duffus with a wheelchair and told him that he had to get into the wheelchair and leave the hospital.

144. Mr. Duffus had no other option than to agree to his discharge.

145. Defendant's staff physically put Mr. Duffus in the wheelchair and wheeled him out of MMC, with the assistance of two JCLO representatives.

146. Once outside the hospital, the two JCLO representatives, neither of whom was a medical professional, placed Mr. Duffus into a taxi with great difficulty, due to his size — about 180 pounds — and the fact that the right side of his body was effectively paralyzed. Once in the taxi, Mr. Duffus was taken to the airport.

147. Upon arrival at the airport, and again with great difficulty due to Mr. Duffus' size and difficulty moving, the JCLO representatives brought Mr. Duffus into the airport and placed Mr. Duffus on the plane.

**F. Defendant's actions resulted in a deterioration in Mr. Duffus' condition and in lasting harm.**

148. As a result of Defendant's failure to ensure appropriate post-discharge care, on Mr. Duffus' return to Jamaica, he had no medical care at all for eighteen days.

149. During this eighteen-day disruption of medical care, Mr. Duffus' condition worsened. Mr. Duffus told his family that he felt worse than he had felt while he was in the hospital. Any progress Mr. Duffus had made through physical therapy, occupational therapy, and speech therapy stopped.

150. During this period, Mr. Duffus was bedridden and fully impaired, unable to speak clearly, unable to move without assistance, and unable to feed himself.

151. Mr. Duffus' family was not able to secure Mr. Duffus' admission to acute rehabilitation.

152. It was not until August 15, 2022 that Mr. Duffus was able to meet with a physical therapist.

153. To get to Mr. Duffus' first outpatient therapy session on August 15, 2022, two men had to carry Mr. Duffus from his bed to the car.

154. During the August 15 physical therapy session, fluctuations in Mr. Duffus' heart rate caused him to collapse, black out, and require immediate medical attention at the emergency room of the Mandeville Hospital in Jamaica.

155. Without the immediate, acute rehabilitation services recommended by several MMC providers, Mr. Duffus has not recovered and continues to experience severe impairments, including difficulty walking, using his right arm and hand, speaking and being understood. Mr. Duffus is also still unable to work.

156. Mr. Duffus will likely never achieve the degree of recovery which he would have achieved had he received the acute rehabilitation which he should have received but did not due to the Defendant's unlawful action in discharging him.

157. Defendant acted with malice or ill will or with knowledge that its actions toward Mr. Duffus violated federal law, or with reckless disregard or callous indifference to the risk that its actions violated federal law.

158. As a direct consequence of Defendant's actions, Mr. Duffus suffered damages, including physical injury, denial of medical care and resulting lack of recovery from his stroke, pain and suffering, humiliation and loss of dignity, mental anguish, emotional distress, hardship, economic losses, and other harm.

## VI. CLAIMS FOR RELIEF

### COUNT I: FAILURE TO STABILIZE EMERGENCY MEDICAL CONDITION (Violation of 42 U.S.C.§ 1395dd)

159. Mr. Duffus incorporates the foregoing allegations.

160. As previously alleged, upon admitting Mr. Duffus for treatment, Defendant determined that Mr. Duffus had a condition which was manifesting itself by acute symptoms of sufficient severity such that that in the absence of immediate medical attention could reasonably be expected to place his health in serious jeopardy, result in serious impairment to his bodily functions and/or result in serious dysfunction of a bodily organ or part.

161. Mr. Duffus therefore had an emergency medical condition as that term is defined in EMTALA, 42 U.S.C.§ 1395dd(e)(1)(A).

162. Upon determining that Mr. Duffus had an emergency medical condition, Defendant was required to "provide either . . . (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or (B) for transfer of the individual to another facility in accordance with subsection (c)." 42 U.S.C. § 1395dd(b)(1).

163. EMTALA defines the term "to stabilize" as "mean[ing], with respect to an emergency medical condition described in [42 U.S.C. §1395dd(e)(1)(A)], to provide such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. §1395dd(e)(3)(A).

164. At 42 U.S.C. §1395dd(e)(4), EMTALA defines the term "transfer" to include discharge.

165. As previously alleged, Mr. Duffus' condition at the time of discharge was likely to materially deteriorate given his paralysis and high risk of fall, lack of plan for his continued care or acute rehabilitation, and insufficient steps to ensure that he would be able to adhere to his blood pressure medication regimen.

166. Defendant thus failed to stabilize Mr. Duffus' condition in violation of EMTALA.

167. As result of Defendant's violation of EMTALA, Mr. Duffus has suffered financial loss, has been and is in need of medical care, and has suffered and is suffering physical pain and suffering, humiliation, inconvenience, discomfort, mental anguish, emotional distress and other injuries.

168. Defendant's violation of EMTALA caused these injuries, and Mr. Duffus would not have suffered these injuries had the Defendant not violated EMTALA.

**COUNT II: INAPPROPRIATE DISCHARGE**
**(Violation of 42 U.S.C.§ 1395dd)**

169. Mr. Duffus incorporates the foregoing allegations.

170. Under EMTALA, "[i]f an individual at a hospital has an emergency medical condition which has not been stabilized (within the meaning of subsection (e)(3)(B)), the hospital

may not transfer the individual unless . . . (B) the transfer is an appropriate transfer." 42 U.S.C. § 1395dd(c)(1)(B).

171. EMTALA defines the term "stabilized" as "mean[ing], with respect to an emergency medical condition described in [42 U.S.C. § 1395dd(e)(1)(A)], that no material deterioration of the condition is likely, within reasonable medical probability, to result from or during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(B).

172. EMTALA provides in relevant part that "[a]n appropriate transfer to a medical facility is a transfer … (B) in which the receiving facility (i) has available space and qualified personnel for the treatment of the individual, and (ii) has agreed to accept transfer of the individual and to provide appropriate medical treatment [and] which meets other such requirements as the Secretary may find necessary in the interest of the health and safety of individuals transferred." 42 U.S.C. § 1395dd(c)(2).

173. Since Mr. Duffus' condition was not stabilized, Defendant was required to make an appropriate transfer as that term is defined in EMTALA.

174. Defendant failed to do so by failing to ensure that there was any medical provider who would treat Mr. Duffus after his discharge, let alone a provider who had available space, qualified personnel and which had agreed to accept the transfer of Mr. Duffus, all in violation of EMTALA.

175. Defendant thus discharged Mr. Duffus in violation of EMTALA.

176. As result of Defendant's violation of EMTALA, Mr. Duffus has suffered financial loss, has been and is in need of medical care, and has suffered and is suffering physical pain and suffering, humiliation, inconvenience, discomfort, mental anguish, emotional distress and other injuries.

177. Defendant's violation of EMTALA caused these injuries, and Mr. Duffus would not have suffered these injuries had Defendant not violated EMTALA.

**COUNT III: DENIAL OF EQUAL RIGHTS ON THE BASIS OF RACE, COLOR AND ANCESTRY IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1866**
**(Violation of 42 U.S.C. § 1981)**

178. Mr. Duffus incorporates all foregoing allegations.

179. Section 1981 of the Civil Rights Act of 1866 provides in relevant part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a).

180. Section 1981 prohibits discrimination against a person on the basis of race, color and ancestry that implicates the right to make and enforce contracts.

181. The right to "'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

182. Mr. Duffus is Black, of African Caribbean and Jamaican ancestry and is a member of a racial minority.

183. Defendant entered into a contractual relationship with Mr. Duffus by admitting him as a patient on July 17, 2022.

184. Defendant outlined additional terms in the contractual relationship with Mr. Duffus by having him sign the Consent to Treatment, which outlined his rights to informed consent, participation in decisions regarding his treatment, participation in planning and making decisions about his discharge, and confidentiality of his medical information.

185. In addition to the specific terms outlined in the Consent to Treatment, Defendant's policies, including the "Patient Care Partnership" and terms of Defendant's Conditions of Participation under Medicare Agreements were benefits, privileges, terms, and conditions of Defendant's contractual relationship with Mr. Duffus.

186. Defendant discriminated against Mr. Duffus and subjected him to disparate treatment on the basis of his race, color, and African Caribbean and Jamaican ancestry by not affording him the treatment that Defendant by contract, policy and practice afforded to other patients.

187. Defendant discriminated against Mr. Duffus by denying and impairing his rights in his contract with Defendant and by denying him equal enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship with Defendant.

188. Defendant denied and impaired Mr. Duffus' contractual rights to informed consent and participation in decisions about his treatment and discharge, by:

a. Failing to provide an interpreter;

b. Not allowing him to designate a proxy for communications;

c. Ignoring his and his family members' wishes for his care and discharge;

d. Treating JCLO staff as his *de facto* decision-making proxy.

189. Defendant denied and impaired Mr. Duffus' contractual rights to confidentiality of his medical information by disclosing his medical information and medical records without his knowledge or consent to JCLO in multiple communications.

190. Defendant denied and impaired Mr. Duffus' contractual rights to choose a provider for his post-hospital care by refusing to communicate with Dr. Blanas about options for his continued care.

191. Defendant denied and impaired Mr. Duffus' rights to make a contract under the ACA for insurance coverage, or to qualify for other payment programs, and instead closed his financial case in favor of Defendant's illegal discharge plan of "repatriation" without any provision for continued necessary and appropriate medical care.

192. Defendant denied and impaired Mr. Duffus' contractual rights to a discharge planning process, and to make decisions about his discharge.

193. Defendant violated Mr. Duffus' rights to enjoy the benefits of his contractual relationship with Defendant by denying him the right to an appropriate transfer under Defendant's Medicare agreements, 42 C.F.R. § 482.43, which required that Defendant discharge or transfer him to an appropriate facility responsible for his ongoing care.

194. Defendant subjected Mr. Duffus to disparate treatment in his medical treatment and discharge, in deviation from Defendant's policy and standard practice as to other patients for treatment and discharge.

195. Defendant subjected Mr. Duffus to disparate treatment in his medical treatment and discharge, in violation of Defendant's contractual obligations and the regulatory requirements governing Defendant's treatment and discharge of patients.

196. Defendant intentionally subjected Mr. Duffus to disparate treatment and intentionally impaired his rights under contract and to make contracts.

197. Defendant was aware of the requirements of federal law guaranteeing all persons equal rights with white persons in matters of contract.

198. Defendant's violations of Mr. Duffus' contractual rights were motivated by bias against Mr. Duffus because of his race, color and ancestry.

199. Defendant's disparate treatment of Mr. Duffus was motivated by bias against Mr. Duffus because of his race, color and ancestry.

200. Defendant's decision to discharge Mr. Duffus for 'repatriation" instead of for appropriate medical treatment was motivated by bias against Mr. Duffus because of his race, color and ancestry.

201. Defendant's claims that its actions toward Mr. Duffus are legitimate are pretext to conceal discrimination against Mr. Duffus, and done in violation of contract, Defendant's own policies, Conditions of Participation under Medicare Agreement, and federal regulations.

202. Defendant's claim that Mr. Duffus gave informed consent as to his plan of discharge is false and pretextual in that in truth Defendant ignored the stated wishes of Mr. Duffus and his family about his discharge, violated his right to participate in decisions about his care and arranged for his discharge without his knowledge or authorization.

203. Defendant's claim that Mr. Duffus consented to the disclosure of his medical information to JCLO, and to JCLO acting as his proxy for decision-making about his discharge is pretext as these acts were done in violation of Defendant's own policies, Conditions of Participation in Medicare, and other federal regulations.

204. Defendant's claim that Mr. Duffus was medically ready for discharge without continued medical treatment is pretext to conceal discrimination against Mr. Duffus, as the discharge was in direct conflict with the recommendations of Defendant's own staff that Mr. Duffus be discharged to an acute rehabilitation facility.

205. Defendant's claim that Mr. Duffus' discharge was appropriate is pretextual in that the discharge violated Defendant's own policies and practices as to discharge, which required

transfer of a patient in Mr. Duffus' impaired condition to an appropriate facility for ongoing medical treatment.

206. Defendant's claim that Mr. Duffus did not qualify for insurance or other coverage for his medical care is pretextual in that Mr. Duffus would have qualified for insurance through the ACA, if Defendant's Coverage Team had not ceased efforts to find coverage for Mr. Duffus once Defendant decided instead to repatriate him.

207. Defendant's discriminatory actions toward Mr. Duffus were intentional and done with malice or knowledge of the risk that it may be acting in violation of Mr. Duffus' rights under federal law or reckless disregard or callous indifference to his federally protected rights.

208. As a direct consequence of Defendant's violations of Mr. Duffus' equal rights under law guaranteed by 42 U.S.C. § 1981, Mr. Duffus suffered damages, including physical injury, denial of medical care and resulting lack of recovery from his stroke, pain and suffering, humiliation and loss of dignity, mental anguish, emotional distress, hardship, economic losses, and other harm.

**COUNT IV: DISCRIMINATION AND DENIAL OF THE BENEFITS OF A HEALTH PROGRAM OR ACTIVITY ON THE BASIS OF RACE AND NATIONAL ORIGIN (Violation of 42 U.S.C. § 18116(a))**

209. Mr. Duffus incorporates all foregoing allegations.

210. In relevant part, the ACA provides that "an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116(a).

211. Defendant is a health program and entity that was receiving federal financial assistance at the time of the alleged events. 42 U.S.C. § 18116(a).

212. Section 18116(a) of the ACA incorporates the prohibitions on discrimination based on race, color and national origin set forth in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

213. Title VI of the Civil Rights Act provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

214. Mr. Duffus is Black, of African Caribbean and Jamaican ancestry.

215. As previously alleged, the benefits of Defendant's health program or activity included Mr. Duffus' rights under his contracts with Defendant, the rights outlined by Defendant's own policies, and the requirements of federal regulation.

216. As previously alleged, Defendant denied Mr. Duffus the benefits of its health program or activity by:

a. Failing to provide an interpreter;

b. Not allowing him to designate a proxy for communications;

c. Ignoring his and his family members' wishes for his care and discharge and otherwise not involving him in his plan of care or discharge;

d. Treating JCLO staff as his *de facto* decision-making proxy;

e. Failing to treat him with respect.

217. As previously alleged, Defendant denied Mr. Duffus the benefits of its health program or activity by disclosing his medical information and medical records without his knowledge or consent to JCLO in multiple communications.

218. As previously alleged, Defendant denied Mr. Duffus the benefits of its health program or activity by refusing to communicate with Dr. Blanas about options for his continued care.

219. As previously alleged, Defendant denied Mr. Duffus the benefits of its health program or activity by failing to allow him to enter into a contract under the ACA for insurance coverage, or to qualify for other payment programs, and instead closing his financial case in favor of Defendant's illegal discharge plan of "repatriation" without any provision for continued necessary and appropriate medical care.

220. As previously alleged, Defendant denied Mr. Duffus the benefits of its health program or activity by denying him an effective discharge planning process.

221. Defendant subjected Mr. Duffus to disparate treatment in his medical treatment and discharge, in deviation from Defendant's policy and standard practice as to other patients for treatment and discharge.

222. Defendant subjected Mr. Duffus to disparate treatment in his medical treatment and discharge, in violation of the regulatory requirements governing Defendant's treatment and discharge of patients.

223. Defendant's violations of Mr. Duffus' contractual rights were motivated by bias against Mr. Duffus because of his race, color and national origin.

224. Defendant's disparate treatment of Mr. Duffus was motivated by bias against Mr. Duffus because of his race, color and national origin.

225. Defendant's decision to discharge Mr. Duffus for "repatriation" instead of for appropriate medical treatment was motivated by bias against Mr. Duffus because of his race, color and national origin.

226. Defendant's claims that its actions toward Mr. Duffus are legitimate are pretext to conceal discrimination against Mr. Duffus, and done in violation of contract, Defendant's own policies, Conditions of Participation under Medicare Agreement, and federal regulations.

227. Defendant's claim that Mr. Duffus gave informed consent as to his plan of discharge is false and pretextual in that in truth Defendant ignored the stated wishes of Mr. Duffus and his family about his discharge, violated his right to participate in decisions about his care and arranged for his discharge without his knowledge or authorization.

228. Defendant's claim that Mr. Duffus consented to the disclosure of his medical information to JCLO, and to JCLO acting as his proxy for decision-making about his discharge is pretext as these acts were done in violation of Defendant's own policies, agreed Conditions of Participation in Medicare, and other federal regulations.

229. Defendant's claim that Mr. Duffus was medically ready for discharge without continued medical treatment is pretext to conceal discrimination against Mr. Duffus, as the discharge was in direct conflict with the recommendations of Defendant's own staff that Mr. Duffus be discharged to an acute rehabilitation facility.

230. Defendant's claim that Mr. Duffus' discharge was appropriate is pretextual in that the discharge violated Defendant's own policies and practices as to discharge, which required transfer of a patient in Mr. Duffus' impaired condition to an appropriate facility for ongoing medical treatment.

231. Defendant's claim that Mr. Duffus did not qualify for insurance or other coverage for his medical care is pretextual in that Mr. Duffus would have qualified for insurance through the ACA, if Defendant's Coverage Team had not ceased efforts to find coverage for Mr. Duffus once Defendant decided instead to repatriate him.

232. Defendant's discriminatory actions toward Mr. Duffus were intentional and done with malice or knowledge of the risk that it may be acting in violation of Mr. Duffus' rights under federal law or reckless disregard or callous indifference to his federally protected rights.

233. Defendant therefore excluded Mr. Duffus from participation in, denied him the benefits of, and subjected him to discrimination under health programs and activities on the basis of "ground[s] prohibited under title VI of the Civil Rights Act of 1964," namely, race, color and national origin. 42 U.S.C. § 18116(a); 42 U.S.C. § 2000(d).

234. As a direct result of the above actions, Mr. Duffus suffered financial loss, loss of appropriate medical care and the resulting lack of recovery from his stroke, physical pain and suffering, humiliation and loss of dignity, inconvenience, and other injuries.

## PRAYER FOR RELIEF

Wherefore, Mr. Duffus prays that this Court grant him relief by:

a) Entering a judgment finding that the Defendant violated Mr. Duffus' rights under EMTALA, 42 U.S.C. § 1981 and the ACA, as alleged herein;

b) Awarding Mr. Duffus full compensatory and consequential damages for all injuries suffered by him;

c) Awarding Mr. Duffus punitive damages;

d) Awarding Mr. Duffus nominal damages;

e) Awarding Mr. Duffus pre-judgment and/or post-judgment interest as allowed by law;

f) Awarding Mr. Duffus his attorneys' fees and costs, and

g) Granting such other relief as the Court deems just and proper.

Respectfully submitted,

Dated: September 22, 2026

/s/ Susan A. Faunce__________
Susan A. Faunce, Esq.
Berman & Simmons, P.A.
P.O. Box 961
Lewiston, ME 04243-0961
(207) 784-3576
sfaunce@bermansimmons.com

/s/ Michael Guare___________
Michael Guare, Esq.
mguare@ptla.org

/s/ Lisa J. Butler____________
Lisa J. Butler, Esq.
lbutler@ptla.org

Pine Tree Legal Assistance
Farmworker Unit
115 Main Street, Second Floor
Bangor, ME 04401
(207) 942-0673

/s/ Talia K. Rothstein_________
Talia K. Rothstein, Esq.
Pine Tree Legal Assistance
Farmworker Unit
88 Federal Street
Portland, ME 04101
(207) 400-3260
trothstein@ptla.org

Attorneys for Plaintiff